URBAN DATA SYSTEMS,
INC., Petitioner,

v.

The UNITED STATES, Respondent.

Appeal No. 79–81.

United States Court of Appeals,
Federal Circuit.

Feb. 4, 1983.

John R. MacKay II, Roseland, N.J., argued for petitioner. With him on the briefs were Daniel A. Schwartz and Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N.J.

Robert M. Hollis, Washington, D.C., argued for respondent. With him on the brief were Asst. Atty. Gen. J. Paul McGrath, and Mark Ramsey, Washington, D.C.

Before FRIEDMAN, RICH, and DAVIS, Circuit Judges.

OSCAR H. DAVIS, Circuit Judge.

Urban Data Systems, Inc. (Urban) seeks review of a decision of the General Services Administration (GSA) Board of Contract Appeals (Board) rejecting Urban's appeal from a GSA contracting officer's decision of June 1979. The contracting officer had denied Urban's claim for $144,429 under two Small Business Administration (SBA) contracts with GSA, involving two subcontracts between petitioner Urban and the SBA. We affirm the Board's decision that the subcontracts had invalid price terms, and remand for determination of the amount of recovery to which Urban is properly entitled.

## I

Urban is a small business located in Newark, New Jersey, eligible for consideration under the § 2[8](a) program of the Small Business Act, 15 U.S.C. §§ 631 *et seq.* (1970).[1] Section 637 of the Act empowers the SBA to enter into contracts with federal agencies and departments and then to subcontract the work to small businesses coming within the bounds of the Act. On August 12, 1975 and February 9, 1976, SBA and GSA entered into contracts GS–OOS–01562 (01562) and GS–OOS–01904 (01904), which called for the supply of specific quan-

---

1. Because the contracts were negotiated and signed in August 1975 and February 1976, we apply the Small Business Act and regulations which were in effect at that time.

tities and types of paper computer forms. Both contracts required SBA "[t]o furnish the supplies ... set forth in this contract according to the specifications and terms and conditions hereof by subcontracting with an eligible concern pursuant to the provisions of section 8(a) [2[8](a)] of the Small Business Act, as amended (15 U.S.C. § 637(a))." Each contract also contained a price adjustment clause:

The price agreed to on this contract has been arrived at on the basis of information presented by the SBA as their cost of performance. By mutual agreement between SBA and GSA this price may be decreased by any amount or increased by not more than 30% based on verified decreases or increases in SBA's cost of performance.

SBA then subcontracted the performance of these paper supply contracts to Urban. On the same day that GSA awarded contract 01562 to SBA, the latter entered into subcontract SB2–10–8(a) 76C–016 (016) with Urban under which Urban agreed to "fulfill and perform all of the requirements of" contract 01562, which was incorporated therein; similarly, on the same day that GSA awarded contract 01904 to SBA, that agency entered into subcontract SB2–10–8(a)76C–103 (103) with Urban under which that subcontractor agreed to "fulfill and perform all of the requirements of" contract 01904, also incorporated. Under the terms of the GSA/SBA contracts, the SBA/Urban subcontracts were to be administered by GSA except with respect to price adjustments, and any cognizable dispute was to be resolved by the GSA contracting officer with right of appeal to the GSA Board of Contract Appeals.

The current controversy arises out of the price adjustment clauses in each of the SBA/Urban subcontracts. With respect to the August agreements (contract 01562 and subcontract 016), Urban had proposed a price of $1,352,728, which apparently included a profit equal to approximately 5 percent of the total cost per unit. The proposed price was later raised to $1,699,064, corresponding to a modification increasing the

quantity of paper to be provided. In subcontract 016 as written and executed, however, that price was not fixed as final. Rather, the parties included the following specially typed-in price adjustment clause:

(5) It is understood by and between the parties hereto that the individual prices for the items as stated herein will be subject to a post-award audit.

It is further agreed that in the event the findings as contained in the audit report indicates [sic] that a reduction in all or any of the unit prices is in order such prices shall be reduced accordingly (utilizing the proposed 5% profit factor) and the total contract value adjusted.

In the negotiations for the February agreements (contract 01904 and subcontract 103), GSA first rejected Urban's original price proposal of $1,544,943, which apparently included approximately 10 percent in profit per unit cost. Negotiations resulted in agreement on a "base price" of $1,193,-672, which could be adjusted upward but not above Urban's originally proposed price, according to the following price adjustment provision:

It is further agreed that in the event the findings as contained in the audit report indicates [sic] that an increase in the unit price is in order such price shall be increased accordingly (utilizing the proposed 10% profit factor) and the total contract value adjusted. The price will not be increased in any amount above the price offered in the proposal.

In short, Urban agreed in subcontract 103 to increase its price, following an audit, with a 10 percent profit above actual costs, while in subcontract 016 it agreed to decrease its price in accordance with an audit, utilizing a 5 percent profit relative to actual costs.

Post-performance audits revealed a cost overrun of $81,254 on subcontract 103 and a cost underrun of $64,318 on subcontract 016. Based on these reports, Urban claimed it was due a net amount of $144,429, calculated as the cost overrun of subcontract 103 plus profit at 10 percent of the total costs

minus the cost underrun on subcontract 016.[2]

This claim was forwarded to the GSA contracting officer, who issued a final decision in June 1979 that Urban was due $21,-846 under the subcontracts' price adjustment provisions. This figure was based on findings that Urban was entitled not to 10 percent profit on the total costs of performance but only on the cost overrun of subcontract 103, and that a 5 percent reduction was to be applied to the cost underrun on subcontract 016.[3]

Urban appealed that decision to the GSA Board of Contract Appeals. In its ruling of July 31, 1981,* the Board agreed with Urban's method of calculating the amounts due on the subcontracts, but determined that both subcontracts were void *ab initio* because the price adjustment clauses are "cost-plus-a-percentage-of-cost" provisions in violation of 41 U.S.C. § 254(b) (1976). The Board further held that because performance had been completed on both contracts and the supplies had been accepted, Urban would be entitled to a recovery on a *quantum valebant* basis upon the submission of a claim to the contracting officer.

Urban requests reversal of the Board's decision, claiming that (1) neither subcontract is a cost-plus-a-percentage-of-cost contract within the meaning of 41 U.S.C. § 254(b); (2) section 254(b) is not applicable to contracts entered into under section 2[8](a) of the Small Business Act; (3) the Government is estopped to deny the validity of the subcontracts; and (4) Urban is in any event entitled to a *quantum valebant* recovery for the reasonable value of the services,

including a 10 percent profit above costs. We consider these contentions in turn.

## II

We must disagree with Urban that the Board erred in concluding that both subcontracts constitute cost-plus-a-percentage-of-cost contracts proscribed by 41 U.S.C. § 254(b) (1976). Section 254(b) provides (in pertinent part) that "[t]he cost-plus-a-percentage-of-cost system of contracting shall not be used," and is incorporated into the Federal Procurement Regulations at 41 C.F.R. § 1–3.401(b) (1976).

■ We accept, at the outset, the general criteria (adopted by the Board) which were developed by the Comptroller General for determining whether a contract is a cost-plus-a-percentage-of-cost contract: (1) payment is on a predetermined percentage rate; (2) the predetermined percentage rate is applied to actual performance costs; (3) the contractor's entitlement is uncertain at the time of contracting and (4) the contractor's entitlement increases commensurately with increased performance costs. 55 Comp.Gen. 554, 562 (1975). These standards incorporate the common understanding of the "cost-plus-a-percentage-of-cost system of contracting," an understanding which was undoubtedly in Congress's mind when it enacted the prohibition.

■ These gauges squarely apply to the subcontracts before us. Subcontract 103 provides for payment at a predetermined 10 percent rate to be applied to actual performance costs, and Urban's entitle-

2. Urban's computation was as follows:

| | | |
|---|---|---|
| (a) | Contract price as awarded (103) | $1,193,672 |
| (b) | Costs incurred (per audit) | 1,274,926 |
| (c) | Cost overrun (b–a) | 81,254 |
| (d) | 10% profit (10% of b) | 127,493 |
| (e) | Total owed Urban on 103 (c + d) | 208,747 |
| (f) | Deduct cost underrun on 016 | 64,318 |
| (g) | Net amount owing Urban (e–f) | 144,429 |

3. This was the contracting officer's calculation:

### Subcontract 103

| | |
|---|---|
| Cost overrun | $81,254 |
| Profit (10% of overrun) | 8,125 |
| Total owing Urban Data on subcontract 103 | $89,379 |

### Subcontract 016

| | |
|---|---|
| Cost underrun | $64,318 |
| Profit reduction (5% of underrun) | 3,215 |
| Total owing Government on subcontract 016 | $67,533 |

#### Set-off

| | |
|---|---|
| Total owing Urban Data | $89,379 |
| Total owing Government | 67,533 |
| Net total owed Urban Data | $21,846 |

\* *Urban Data Systems, Inc. v. United States*, 81–2 BCA ¶ 15,254 (1981).

ment, which was uncertain at the time of contracting, would increase commensurately with increased performance costs. *See Laburnum Construction Corp. v. United States,* 325 F.2d 451, 459 (Ct.Cl.1963) (profit on costs incurred during delay disallowed as violative of proscription against cost-plus-a-percentage-of-cost procurement). No showing of unfair or inefficient increase in price or costs is necessary in order to render such a contract illegal. "The theoretical contravention of the prohibition is adequate to make the arrangement illegal." *Air Repair, G.M.B.H.,* ASBCA No. 10288, 67–1 B.C.A. (CCH) ¶ 6115 (1967).

██ A comparable defect exists in subcontract 016. In the Board's words: "Contract 016 constitutes a unique but nonetheless prohibited cost-plus-a-percentage-of-cost contract. The contract is unique in that its provisions provide for *reductions* rather than increases in the contract price. * * * * * In light of the circumstances surrounding the negotiation of the contract; *i.e.,* the apparent total reliance upon the appellant's cost data; after the fact auditing; and the tacit but consistent agreement of the parties that the contract price was to be reduced by the amount of the costs included in the price but not in fact incurred plus the amount of profit applicable to such unincurred costs; *we can but conclude that the contractual scheme envisioned by appellant was that the appellant was to be paid its audited costs plus five percent of those costs.* We are driven to this conclusion by the mathematics of the contractual mechanism by which a contract price is calculated on estimated costs plus a five percent profit with the contractor to receive payment of the contract price less its unincurred costs which were included in the contract price together with the profit applicable to such unincurred costs. This results in the contract price *paid* [emphasis in original] (which is, after all, what counts) being the costs actually incurred plus five percent of those costs. We do not consider that contract number 016 ever had a contract price in any true sense of that term. The contract price was stated as $1,352,728. Had it

been stated as $2,352,728, under the contractual scheme the result would have been the same. *In short, the appellant, under contract number 016, was at all times under an incentive to incur costs to within ninety-five percent of the original contract price i.e., its estimated costs plus five percent.* Consequently, the contract, in light of its interpretation by appellant, falls squarely within the prohibition." (emphasis added, except as indicated).

Urban stresses that its original proposals were fixed in amount and not subject to change. But the record is plain that the Government was dissatisfied with those proposed prices, and neither contract as written established a contract price fixed in amount and free from change. *See Muschany v. United States,* 324 U.S. 49, 62, 65 S.Ct. 442, 449, 89 L.Ed. 744 (1945). As the Comptroller General has stated in reviewing the viability of a cost-plus-a-percentage-of-cost contract:

> Where a subcontract violative of the prohibition is made—in whatever form or disguise—it is plainly invalid at least insofar as establishing an obligation on the Government to make reimbursement of an amount representing the subcontractor's claimed costs plus a percentage of such costs.

33 Comp.Gen. 533, 536 (1954).

Urban urges, too, that the specific contractual provisions provide not for cost-plus-a-percentage-of-costs but for "price redetermination" consistent with section 254(b) and similar to an arrangement sanctioned by the Court of Claims in *National Electronic Laboratories, Inc. v. United States,* 148 Ct.Cl. 308, 180 F.Supp. 337 (1960). Of course, mere use of the term "price redetermination" does not camouflage the cost-plus-a-percentage-of-cost system actually called for by both subcontracts to determine the Government's liabilities to Urban. *National Electronics Laboratories* was quite different. It involved no provision under which the contract price was computed by adding to the actual costs a predetermined percentage of those costs, as

proscribed by section 254(b). Rather, that contract provided that within 60 days of the contract's completion the contractor would document its costs and the parties would attempt to negotiate a "reasonable revised price" which would not exceed a designated upper limit, giving consideration to the "efficiency, economy and ingenuity" with which the contractor performed the contract. 180 F.Supp. at 339. That provision for renegotiation, spelling out the factors to be considered, is not at all the same as Urban's rigid formulas for determining price as a function of actual costs plus a percentage of those costs.

◼ Moreover, the ceiling prices designated in both Urban subcontracts did not remove those agreements from the injunction against cost-plus-a-percentage-of-cost contracting. There is nothing in the statute, or its background or objectives, to distinguish a "cost-plus-a-percentage-of-cost-up-to-a-designated-limit" system of contracting from an unlimited cost-plus-a-percentage-of-cost system. Neither the method of computing final cost to the Government nor the evils inherent in such a process are significantly altered by the inclusion of an upper limit. Cf. 38 Comp.Gen. 38, 40 (1958) (cost limitations are not sufficient to save such contracts from violating the prohibition.) As in any cost-plus-a-percentage-of-cost contract, there still remains an incentive to the contractor "to pay liberally for reimbursable items because higher costs mean a higher fee to him, his profit being determined by a percentage of cost." Muschany v. United States, 324 U.S. 49, 62, 65 S.Ct. 442, 449, 89 L.Ed. 744 (1945). The key is that the contractor is penalized for efficient and economical performance and rewarded for noneconomical performance.

The prohibition against cost-plus-a-percentage-of-cost contracts protects against exploitation of the government's resources by contractors who might take advantage of the open-ended system by unduly increasing costs—and thus their profits—or might simply enjoy the spur of an incentive to increase costs (deliberately or carelessly) by being unconcerned, profligate, or wasteful. At the same time, Congress's prohibition tends to prevent the development of a "buddy system" between contractors and government procurement officials in which the latter might favor some contractors with the well-known advantages of that form of contracting. Were the statutory prohibition inapplicable to agreements stipulating a ceiling price, the contracting parties could avoid the legislative stricture simply by setting high ceilings. We cannot imagine that Congress envisioned such a loophole in establishing protection for the Government against the exploitation possible in cost-plus-a-percentage-of-cost contracts.[4]

### III

◼ As for the point that, even if the particular subcontract provisions would ordinarily violate section 254(b) they do not do so here because of "special consideration afforded 8(a) [2[8](a)] companies by the Small Business Act," we find no indication that Congress excepted 2[8](a) companies from the broad proscription of section 254(b) when contracting with the Government. The Small Business Act does entail a system of contracting in which small businesses are not required to be price competitive with larger, established businesses in order to contract with the Government. See Eastern Canvas Products, Inc. v. Brown, 580 F.2d 675, 685–86 (D.C.Cir.1978); 15 U.S.C. § 631(a) (1970); 13 C.F.R. § 124.-8–2(d) (1975). But this is not to say that Congress condoned cost-plus-a-percentage-of-cost contracting with such companies. The prohibition of section 254(b) is general

---

4. There has never been any doubt that the statutory prohibition applies to individual agreements which are not part of a contractual series used regularly or from time to time by the procuring agency. The statutory phrase "system of contracting" refers to the general format of the particular agreement and was intended, we think, to include all agreements subject to the vice against which Congress aimed (including subcontracts and contracts of that character with a ceiling on the ultimate price).

and across-the-board, covering in its terms all government contracting.

Urban suggests that authority to engage in cost-plus-a-percentage-of-cost contracts was given by 15 U.S.C. § 637(a)(1)(A) (1980), granting procurement officers the power to contract with the SBA (which then subcontracts to an 2[8](a) business) "upon such terms and conditions as shall be agreed upon between the ... [SBA] and the procurement officer." [5] There is, however, nothing in that language (or any other provision in the Act) to suggest that the SBA Administrator was immune to otherwise generally applicable procurement laws, including the proscription of 41 U.S.C. § 254(b) against cost-plus-a-percentage-of-cost contracts. The discretion to contract "upon such terms and conditions as shall be agreed upon ...." allows the acceptance of contract prices not competitive with non-2[8](a) businesses, but does not suggest that otherwise illegal terms or conditions would be permissible under the small business statute. *Cf. Yosemite Park and Curry Co. v. United States,* 582 F.2d 552, 558–559 (Ct.Cl.1978) (authority of the Secretary of the Interior to contract "at rates approved by him" does not exempt contracts to which he is a party from the requirement of 41 U.S.C. § 254(b) of a 10 percent limit on "cost-plus-a-fixed-fee" contracts.) In the absence of indication that Congress so intended, the statutory provision to contract upon agreed "terms and conditions" should not be read to authorize disregard of the general statutory prohibitions with respect to government contracting, such as the prohibition against an interest by a member of Congress in the agreement (41 U.S.C. § 22), improper assignment (41 U.S.C. § 15), and kickbacks (41 U.S.C. § 51)—as well as the injunction against use of the cost-plus-a-percentage-of-cost system of contracting. Congress could have, but did not, expressly allow such an exemption for government contracts with 2[8](a) businesses. Nor is there any basis for implying such an exception; there is nothing about the 2[8](a) program to suggest that the goals of the Small Business Act can be achieved only, or even better, by utilizing cost-plus-a-percentage-of-cost contracts.

### IV

Urban asserts that, in any event, the Government is estopped from raising this defense of invalidity because (1) the 2[8](a) program is aimed at encouraging SBA and government agencies to help small businesses achieve a competitive position in the marketplace, *see Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696, 702 (5th Cir. 1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974); 13 C.F.R. § 124.8–1(b) (1975); (2) the Urban contracts included their price provision at the insistence of the Government, were on the government's forms, and utilized the government's contract clauses; and (3) Urban acted to its detriment in reliance on the government's conduct.

 Even if we accept the truth of these contentions [6] we cannot estop the Government from showing that it had no power to enter into the challenged price terms. As stated by the Court of Claims in *Yosemite Park and Curry v. United States,* 582 F.2d 552 (Ct.Cl.1978), when considering a question of estoppel against the Government:

> Any consideration of this problem must begin with the maxim that the United States is not bound by its agents acting beyond their authority and contrary to regulation. *See Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 [, 68 S.Ct. 1, 3, 92 L.Ed. 10] (1947); *Porter v. United States,* 204 Ct.Cl. 355, 366, 496 F.2d 583, 590 (1974), *cert. denied,* 420 U.S. 1104 [, 95 S.Ct. 1446, 43 L.Ed.2d 761] (1975).

---

**5.** Section 637(a)(1) of the 1970 Act, in effect at the time these subcontracts were executed, contains language identical to that quoted by Urban from the 1980 statute.

**6.** The Board found as a matter of fact that "[i]t is impossible to discern from the record wheth-er these additional provisions were added at the instigation of the appellant or the respondent." We reach the same conclusion upon examination of the record.

"One who purports to contract with the United States assumes the risk that the official with whom he deals is clothed with actual authority to enter the contract alleged." *Haight v. United States,* 209 Ct.Cl. 698, 538 F.2d 346, *cert. denied,* 429 U.S. 841 [, 97 S.Ct. 116, 50 L.Ed.2d 110] (1976), and the United States will not be estopped to deny the acts of its agents who have acted beyond the scope of their actual authority. *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 9, 479 F.2d 1334, 1338 (1973); *California-Pacific Util. Co. v. United States,* 194 Ct.Cl. 703, 720 (1971).

582 F.2d at 558.

■ The Supreme Court most recently reasserted this principle in *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981), in which Hansen failed to file a written application for "mothers insurance benefits" under the Social Security Act, as a result of erroneous advice not to file the application (this application being required by statute) given by a Social Security Administration field representative. The Government was not estopped from denying retroactive benefits in spite of the error by its agent.[7] Similarly, even if the government's agent instigated the inclusion of the cost-plus-a-percentage-of-cost provisions in the two subcontracts, we cannot estop the Government from denying their validity. As the Court noted in *Hansen,* it is "the duty of all courts to observe the conditions defined by Congress for charging the public treasury," quoting *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), 450 U.S. at 788, 101 S.Ct. 1471. One such condition is the proscription against cost-plus-a-percentage-of-cost contracts in 41 U.S.C. § 254(b).

Urban cites cases from the Court of Claims and the Court of Appeals for the Ninth Circuit, but we find no support for petitioner in those decisions. The present litigation is unlike *Nash v. United States,* 141 Ct.Cl. 135 (1958), a Congressional reference case, in which the Court of Claims was referred a question by Congress regarding the actions of Public Housing Authority officials. While holding that the plaintiff did have an "equitable claim" against the Government, the Court explicitly underscored the rule in *Federal Crop Insurance Corporation v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947) and allowed recovery based upon "general equitable considerations" which are utilized only in such Congressional reference cases. *See also Burkhardt v. United States,* 113 Ct.Cl. 658, 84 F.Supp. 553 (1949). Nor will Urban "sustain such a profound and unconscionable injury in reliance on the [Government's] action as to require, in accordance with any sense of justice and fair play, that the [Government] not be allowed to inflict the injury." *United States v. Lazy FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973), quoting *Schuster v. C.I.R.,* 312 F.2d 311, 317 (9th Cir.1962). Even if we accept *arguendo* the proposition that evidence of such rare circumstances would impose estoppel upon the Government, we find no such circumstances here. Urban is not subject to such profound and unconscionable injury in light of its entitlement to at least some and possibly all of its claimed recovery on a *quantum valebant* basis (*see* Part V, *infra* ).

## V

■ It is clear, however, that the Government bargained for, agreed to pay for, and accepted the supplies delivered by Urban. It is also plain that only the price terms of the two subcontracts were invalid—not any other part of those agreements. We agree with the Board that Urban is entitled to reimbursement on a *quantum valebant* basis for the reasonable value in the marketplace of the supplies and concomitant services. *See Cities Service Gas Co. v. United States,* 500 F.2d 448, 457 (Ct.Cl.1974) and cases cited therein.[8]

---

**7.** The Court suggested that evidence of "affirmative misconduct" by a government agent might be sufficient to estop the Government from insisting upon compliance with otherwise valid statutes or regulations, 450 U.S. at 788, 101 S.Ct. at 1471. The record here supports no claim of affirmative misconduct by the Government.

**8.** *Cities Service* discusses a *quantum meruit* rather than a *quantum valebant* basis for recovery. The difference is of no significance

The question of *quantum valebant* is not appropriate for final resolution at this time. There has been no decision on amount either by the contracting officer or the Board. The record is inadequate for us to decide, and therefore we remand to the Board of Contract Appeals for determination of this matter.[9] In deciding the amount to which Urban is entitled, the Board should be mindful of the special 2[8](a) context in which these contracts were negotiated. We emphasize four points. First, the value to be determined should be based "on the *reasonable value in the marketplace* of the property sold," not on costs. *Cities Service, supra*, 500 F.2d at 457 (emphasis added). Second, the "marketplace" in this case is not the competitive arena of all businesses, large and small, who could have supplied the contract goods. Rather, the marketplace is only that of 2[8](a) businesses because the original GSA/SBA contracts both properly stipulated that SBA was to "subcontract[ing] with an eligible concern pursuant to the provisions of Section 8(a) [2[8](a)] of the Small Business Act." Under the 2[8](a) program, contracts may be let at a price in excess of that at which a non-2[8](a) business could perform, as a means of encouraging small businesses to achieve a competitive place in the market. *See Eastern Canvas Products,*

*Inc. v. Brown,* 580 F.2d 675, 685–86 (D.C. Cir.1978); *Ray Baillie Trash Hauling, Inc. v. Kleppe,* 477 F.2d 696, 708 (5th Cir.1973), *cert. denied,* 415 U.S. 914, 94 S.Ct. 1410, 39 L.Ed.2d 468 (1974); *see also* 13 C.F.R. §§ 124.8–1(b), 124.8–2(d) (1975). Third, the circumstances of the case require that the Board also take into account the general advantages to the Government inherent in the 2[8](a) program of contracting with small business. The Government contracted, not only for the specific goods, but for the less tangible advantages of training Urban, a small business, and giving it experience in the business world. This is a benefit of some value to the Government, which should be melded into the ultimate determination (unless it is found that no such benefit was in fact received at all in this case). Fourth, the appropriate amount of interest should be included in Urban's recovery, pursuant to the general provisions of both contracts.[10]

We leave it to the Board to determine whether the value to the Government in these circumstances included the 10 percent profit claimed by Urban, or some other amount of profit. In similar circumstances the Court of Claims noted that "[n]o better answer [to the question of fair compensation] can be given than what the parties

here. The former is said to apply to services and the latter to goods, but the Court of Claims generally considered questions of recovery for any contract implied in fact—whether for services or goods—on a *quantum meruit* basis. *See also Allstates Van Lines Corporation v. United States,* 215 Ct.Cl. 1075 (1978). Here we deal with a contract implied in fact because the parties did have an actual agreement to supply and buy the paper, *see Somali Development Bank v. United States,* 508 F.2d 817 (Ct.Cl. 1974), and we follow the Board's use of the term *quantum valebant.*

9. If the Board wishes, it may first require an initial determination by the contracting officer, but we do not direct it to take that step.

10. The pertinent provision reads:
25. *Payment of Interest on Contractors' Claims*
(a) If an appeal is filed by the Contractor from a final decision of the Contracting Officer under the Disputes clause of this contract, denying a claim arising under the contract, simple

interest on the amount of the claim finally determined owed by the Government shall be payable to the Contractor. Such interest shall be at the rate determined by the Secretary of the Treasury pursuant to Public Law 92–41, 35 Stat. 97, from the date the Contractor furnishes to the Contracting Officer his written appeal under the Disputes clause of this contract, to the date of (1) a final judgment by a court of competent jurisdiction, or (2) mailing to the Contractor of a supplemental agreement for execution either confirming completed negotiations between the parties or carrying out a decision of a board of contract appeals.
(b) Notwithstanding (a), above, (1) interest shall be applied only from the date payment was due, if such date is later than the filing of appeal, and (2) interest shall not be paid for any period of time that the Contracting Officer determines the Contractor has unduly delayed in pursuing his remedies before a board of contract appeals or a court of competent jurisdiction.

agreed upon." *Pacific Maritime Association v. United States,* 108 F.Supp. 603, 607 (Ct.Cl.1952); *see also* 38 Comp.Gen. 38, 40 (1958). But we make no such direction to the Board, merely observing that this can be one possibility for compensation.

We affirm the opinion of the GSA Board of Contract Appeals and remand to that Board the question of *quantum valebant* for consideration in accordance with this opinion.

AFFIRMED AND REMANDED.