GOLD LINE REFINING, LTD., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 98–543 C.

United States Court of Federal Claims.

March 25, 1999.

Ronald H. Uscher, Washington, DC, for plaintiff. Donald A. Tobin, Washington, DC, of counsel.

Reginald T. Blades, Jr., with whom were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director, U.S. Department of Justice, Washington, DC, for defendant. Howard Kaufer, Office of Counsel, Defense Energy Support Center, Ft. Belvoir, VA, of counsel.

## OPINION

HEWITT, Judge.

Plaintiff, Gold Line Refining, Ltd. ("Gold Line") seeks damages resulting from the use of an unauthorized economic price adjust-

ment clause [1] in its contract to supply jet fuel to the United States of America, acting through the Defense Fuel Supply Center ("DFSC" or the "government").[2] Plaintiff advances several theories of recovery: quantum meruit, reformation or other equitable relief allowed under the Contract Disputes Act, including contract reformation for mutual mistake, and contract reformation for unilateral mistake. Defendant moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(4) of the Rules of the United States Court of Federal Claims ("RCFC"). For the following reasons, defendant's motion to dismiss is DENIED in part and GRANTED in part.

## I. Background

Gold Line operates a petroleum refinery in Lake Charles, Louisiana. Gold Line responded to an April 15, 1993 solicitation by DFSC for offers to supply military jet fuel.[3] On September 8, 1993, DFSC awarded a contract to Gold Line for JP-4 jet fuel, a naphtha-based product manufactured to military specifications. Several weeks later DFSC amended the contract to include the delivery of additional JP-4 jet fuel. On October 6, 1993, DFSC amended the contract for a second time to include the delivery of 56,095,200 gallons of JP-8 jet fuel, a kerosene-based type of military jet fuel, to certain East/Gulf Coast locations during the period April 1, 1994 through March 31, 1995. The JP-8 fuel purchased under the second amendment to Gold Line's contract was DFSC's first purchase of JP-8 jet fuel on the U.S. Gulf Coast. For the preceding 30 years, DFSC's purchases on the Gulf Coast had been almost exclusively of JP-4 type jet fuel. No commercial market exists for either JP-8 or JP-4 jet fuel. The award price for the JP-8 fuel was $0.607700 per gallon. Gold Line's complaint is about the amount it was paid for the JP-8 fuel.

The solicitation was for a fixed-price contract with an economic price adjustment ("EPA") clause—Clause B19.33, Economic Price Adjustment—Published Market Price (Domestic Bulk) (DFSC Nov. 1992). According to Gold Line, DFSC included Clause B19.33 in the solicitation "in order to protect DFSC and awardees from significant market volatility, including fluctuations in the price of raw materials, such as historically volatile crude oil." Complaint ("Compl.") at ¶ 17. The use of an EPA clause to achieve this purpose is permitted by the Federal Acquisition Regulation ("FAR"). See 48 C.F.R. § 16.203-3 (1993). Gold Line claims that Clause B19.33 failed in its purpose because it used an adjustment formula and reference prices that both failed to reflect Gold Line's actual raw material costs (Compl. at ¶ 37) and, moreover, failed to comply with applicable FAR provisions governing the permissible forms of EPA clauses in fixed price contracts. Compl. at ¶ 40. See 48 C.F.R. § 16.203-1 (1993).[4]

---

1. In *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed.Cl. 405 (1992) ("*MAPCO*"), the Court of Federal Claims held that a substantially identical economic price adjustment ("EPA") clause was unauthorized under Federal Acquisition Regulation ("FAR") Subpart 16.2, which governs the use of EPA clauses in federal government contracts. See 27 Fed.Cl. at 408, 416. Here, without conceding that *MAPCO* was correctly decided, DFSC declines to challenge the *MAPCO* holding.

2. On or about February 1, 1998, DFSC changed its name to the Defense Energy Support Center ("DESC"). The facts recited in this opinion are as set forth in the complaint, unless otherwise noted. Particular paragraphs of the complaint are sometimes noted for convenience of reference.

3. In response to DFSC Solicitation No. DLA600-93-R-0161, Gold Line submitted an offer to supply fuel as a small disadvantaged business

("SDB") pursuant to the Small Business Act, 15 U.S.C. §§ 631–657, the Armed Services Procurement Act, 10 U.S.C. §§ 2302–2331 and the Department of Defense Supplement to the Federal Acquisition Regulation, 48 C.F.R. Part 219 (1993). As a SDB company, Gold Line was eligible to receive contract awards from the Department of Defense at prices up to ten percent (10%) above prices paid to non-SDB companies.

4. Clause B19.33 outlines an interim and a final billing price for the fuel delivered by the contractor to DFSC during a month. As to the JP-8 fuel, DFSC calculated the interim billing price using an average of commercial jet fuel prices in Houston, Texas and Linden, New Jersey, as published in the Oil Price Information Service ("OPIS"), a private publishing company. To determine the final billing price for the JP-8 fuel, DFSC relied upon the Petroleum Marketing Monthly ("PMM"), an official publication of the Energy Information Administration of the United

By letter dated November 22, 1994, Gold Line asked DFSC to amend the contract (as permitted under Clause B19.33) to substitute other monthly reference prices for the JP–8 fuel during the period from April 1994 through July 1994. Gold Line sought substitute reference prices because the final contract price for the JP–8 fuel did not reflect actual crude oil costs or what Gold Line believed to be market conditions. DFSC denied the request a month later.

On May 31, 1995, Gold Line submitted a certified claim to the DFSC contracting officer for alleged improper price reductions totaling $3,048,789.00. After discussions with DFSC about its claim, Gold Line reduced its claim to $1,477,084.00. The contracting officer issued a final decision on July 1, 1997 denying plaintiff's claim. While the contracting officer determined that Clause B19.33 violated FAR Subpart 16.2 under the *MAPCO* decision (see n.1), the contracting officer also concluded that Gold Line had not suffered damages.

On June 25, 1998, Gold Line filed its complaint with the Court of Federal Claims.[5]

II. Discussion

DFSC moves to dismiss Gold Line's complaint on the grounds that the Court of Federal Claims lacks jurisdiction "to entertain the merits of the complaint" and that the complaint fails to state a claim upon which relief can be granted. Defendant's Motion to Dismiss ("DFSC Motion") at 1.

The Supreme Court recently restated in *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, ——, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998), that determining whether subject matter jurisdiction exists is an "inflexible" threshold matter. Accordingly, this court addresses the jurisdiction issue first.

A. Subject Matter Jurisdiction

 Plaintiff claims jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1)(1994). The Tucker Act provides in pertinent part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1). With respect to implied contracts, the court's jurisdiction is limited to implied-in-fact contracts. *Hercules Inc. v. United States*, 516 U.S. 417, 423, 116 S.Ct. 981, 985, 134 L.Ed.2d 47 (1996); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997). The court's jurisdiction does not extend to implied-in-law claims. *Hercules Inc.*, 516 U.S. at 423, 116 S.Ct. 981; *Trauma Serv. Group*, 104 F.3d at 1327. A complaint containing "a well pleaded allegation of an underlying express, or implied-in-fact, contract 'is sufficient to overcome challenges to jurisdiction' in the United States Court of Federal Claims." *Buesing v. United States*, 42 Fed.Cl. 679, 687 (1999) (quoting *Trauma Serv. Group*, 104 F.3d at 1325). Whether subject matter jurisdiction exists here turns on the effect of Clause B19.33 on Gold Line's contract, more specifically, whether the inclusion of the clause makes it legally impossible to view the contract as either express or implied-in-fact.

DFSC's explanation of its challenge to this court's jurisdiction appears in a footnote. First, DFSC points out in the text of its Memorandum of Law that Gold Line's complaint contains the following statement, "The

States Department of Energy. Specifically, DFSC looked to the price of "Kerosene Type Jet Fuel Sales to End Users" from two different geographic Petroleum Administration for Defense Districts ("PADD"), designated in the PMM as 50% PADD I and 50% PADD III. Averaging the sales prices from the two PADDs, DFSC calculated the final billing price. As stated in its solicitation, DFSC determined the final billing price three months after the interim billing price. Pursuant to Clause B19.33, the final billing price adjusts the interim award price upward or downward. Gold Line complains that the prices in the PMM—the basis in the contract for the final

billing price—peaked in February 1993 and sank to their lowest points in March, April and May 1994. Compl. at ¶ 35. Gold Line alleges that during this time DFSC took excessive and wrongful final billing price reductions under Clause B19.33. *Id.* at ¶ 36.

5. Gold Line, a Texas limited partnership, has a Chapter 11 petition pending in the Bankruptcy Court for the Southern District of Texas, Houston Division and filed its complaint as debtor-in-possession.

inclusion of the illegal clause B19.33 in Gold Line's contract rendered the contract illegal in its entirety." DFSC Motion at 2 (quoting Compl. at ¶ 50). DFSC then observes in a footnote that "if the contract is illegal in its entirety, *i.e.*, void *ab initio*, there would be no contract ... under which to seek a remedy." *Id.* at n. 2. The effect of the inclusion of Clause B19.33 on Gold Line's contract, however, is a question of law for the court. *See Pacific Architects and Eng'rs Inc. v. United States*, 230 Ct.Cl. 1024, 1026–1027 (1982). The court is not bound by a suggested conclusion of law, whether contained in the complaint or in the DFSC's Memorandum of Law.

The only contract term of which Gold Line complains is EPA Clause B19.33. Because Gold Line has claimed that the price term of its otherwise express contract is "illegal" (Compl. at ¶ 43), and seeks to remedy the effect of that illegal clause in this court, it appears that Gold Line's contract is not fully "express" within the four corners of its contract documents. Accordingly, we examine whether Gold Line's contract, to the extent not express, is nevertheless entitled to be treated as a contract implied-in-fact. The Federal Circuit case of *Urban Data Sys., Inc. v. United States*, 699 F.2d 1147 (Fed.Cir. 1983) is particularly instructive.

In *Urban Data Systems*, the Federal Circuit considered a claim for recovery under certain contracts for the supply of paper computer forms. Each of the contracts contained an unlawful price adjustment clause. The price adjustment clauses were "costs plus a percentage of costs" provisions which clearly violated the public contract requirements set forth in 41 U.S.C. § 254(b) (1976). The court found that the price term was the only invalid portion of the agreements for supplies. *Urban Data Sys., Inc.*, 699 F.2d at 1154. The court further found "that the Government bargained for, agreed to pay for, and accepted the supplies delivered by [the contractor]." *Id.* Because the parties had an "actual agreement" to supply and buy paper, the court concluded that an implied-in-fact contract existed. *Id.* at n. 8.

In this case, plaintiff alleges and defendant does not dispute that Gold Line offered to supply jet fuel to DFSC. Nor do the parties dispute that DFSC accepted the offer by awarding a supply contract to plaintiff. Nor do the parties disagree on the volume of fuel to be supplied, the delivery sites for the fuel, or the initial price per gallon price to be paid for the fuel. Compl. ¶¶ 14, 15; DFSC Motion at 3. Unchallenged allegations of the complaint should be construed in the light most favorable to plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The court finds that the parties had an "actual agreement" that Gold Line would supply jet fuel and the government would pay for it. As a matter of law, the court concludes that Gold Line's contract with DFSC, to the extent not express, is implied-in-fact and is subject to this court's jurisdiction. *See Urban Data Sys., Inc.*, 699 F.2d at 1154, n. 8.

## B. Gold Line's Claims for Relief

Gold Line asserts that it is entitled to recover monetary damages under a theory of "quantum meruit, reformation, or other such equitable relief allowed under the Contract Disputes Act" (Compl. at ¶ 53), or under a theory of "contract reformation to eliminate the impact of the mutual mistakes [as to the price adjustment mechanism]" (*Id.* at ¶ 58), or as a remedy for Gold Line's unilateral mistake regarding the effect of Clause B19.33. *Id.* at ¶¶ 63, 64.

The government asserts that this court lacks "jurisdiction to entertain the merits of the various theories of recovery." DFSC's Motion at 2. But, on the authority of *Urban Data Systems*, this court has found that it has subject matter jurisdiction in this case because there is an actual agreement between Gold Line and DFSC, a contract which, to the extent it is not express, is implied-in-fact, notwithstanding that the contract contains an unauthorized price adjustment clause.

The court now considers whether any of Gold Line's proposed theories of recovery is otherwise unavailable as a matter of law as a possible remedy for Gold Line's claim under its contract.

## 1. Quantum Meruit

The Court of Appeals for the Federal Circuit has recognized the equitable remedy of quantum meruit as a basis of recovery under an implied-in-fact contract.[6] *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1154 (Fed.Cir.1983). In *United States v. Amdahl Corp.,* 786 F.2d 387 (Fed.Cir.1986), the Federal Circuit observed:

> Where a benefit has been conferred by the contractor on the government in the form of goods or services, which it accepted, a contractor may recover at least on a quantum valebant or quantum meruit basis for the value of the conforming goods or services received by the government prior to the rescission of the contract for invalidity. The contractor is not compensated under the contract, but rather under an implied-in-fact contract.

786 F.2d at 393. In reaching its decision, the *Amdahl* court relied upon the reasoning set forth in *Prestex, Inc. v. United States,* 162 Ct.Cl. 620, 320 F.2d 367 (1963). The Court of Claims there stated, in pertinent part, that "[e]ven though a contract be unenforceable against the Government, ... it is only fair and just that the Government pay for goods delivered or services rendered and accepted under it." *Prestex,* 320 F.2d at 373.

■ The decisions in *Urban Data Systems, Amdahl,* and *Prestex* contemplate that when the government retains benefits in the form of goods or services under a contract determined invalid for failure to comply with certain regulatory requirements or bidding procedures, courts may grant relief of a quasi-contractual nature to the contractor.[7] As the Court of Claims noted in *Prestex,* "ordinary principles of equity and justice preclude the United States from retaining the services, materials, and benefits and at the same time refusing to pay for them on the ground that the contracting officer's promise was unauthorized, or unenforceable for some other reason." *Prestex, Inc.,* 320 F.2d at 373.

---

6. While acknowledging during oral argument that *Urban Data* is binding precedent on this court, the government noted a conceptual difficulty in applying the equitable remedy of quantum meruit as relief in a case involving an implied-in-fact contract or an express contract with a defective price term:

> THE COURT: Is Urban Data not an implied-in-law case?
>
> MR. BLADES [for the government]: I don't believe—Urban Data was an express contract that had a cost-plus-percentage-of-cost pricing mechanism.
>
> THE COURT: Let's just push that a little bit. Isn't the cost-plus-percentage-of-cost, isn't that—that is not even under the FAR, although it may be in the FAR, but there is a congressional enactment—
>
> MR. BLADES: Right. There is a statute that says it's illegal, much like the Clark case. That kind of contract was illegal.
>
> THE COURT: Right. So now you have a contract that has a hole in it, which if I were to conclude that 19.33 was vaporized by FAR provisions, would be more or less our situation. How is [*Urban Data*] different? [The *Urban Data*] case is still, I think, good law.
>
> MR. BLADES: Urban Data?
>
> THE COURT: Yes.
>
> MR. BLADES: A binding precedent? Yes, it is.
>
> . . . .
>
> THE COURT: How is [*Urban Data*] different? It is a contract whatever it was—paper forms—it was performed at least up to some point—to [where] money was owed, or at least claimed. And a piece of the contract dropped out and that would be the circumstance that would occur here if I were to agree with a couple of other precedents [that] 19.33 vaporized in the face of the FAR. How is that different? It has Quantum Meruit, Quantum Val[e]bant—
>
> MR. BLADES: Perhaps, it would be helpful to the rest of us if they think of some other term to use when what they need to and what the Court needs to do is provide a price for an otherwise valid contract.
>
> THE COURT:—well, but that's B[e]ta Systems, and the Government doesn't like reformation much either.
>
> MR. BLADES: Right. In Urban Data, what the Court of Appeals ultimately did was send it back to the board to figure out what the price ought to be and pointed out that the most obvious choice is the price agreed upon by the parties. Now, to the extent that the price was illegal because it was cost plus percent of cost, that seems contradictory .... 3/15/99 Transcript ("3/15/99 Tr.") at 42–43.

7. The *Prestex* line of cases is distinguishable from other court decisions holding that the government agent lacked contracting authority. Without proper contracting authority, a government agent is unable to bind its principal and, as a matter of law, an implied-in-fact contract cannot exist. *See Cincinnati v. United States,* 153 F.3d 1375 (Fed.Cir.1998); *Trauma Serv. Group v. United States,* 104 F.3d 1321 (Fed.Cir.1997); *Northrop Grumman Corp. v. United States,* 42 Fed.Cl. 1 (1998); *General Eng'g & Mach. Works v. O'Keefe,* 991 F.2d 775 (Fed.Cir.1993).

■ Here, where the contract has been fully performed by the contractor and has not been disavowed by the government, the rationale for recognizing a right to recover appears to this court to apply with even greater force. Accordingly, this court concludes that Gold Line's claim for quantum meruit relief is a claim on which relief be granted.

## 2. Reformation or Other Equitable Relief

As an alternative remedy, Gold Line seeks reformation or "other equitable relief allowed under the Contract Disputes Act" (Compl. At ¶ 53) including reformation to "eliminate the impact of the mutual mistakes." Compl. at ¶ 58. In *Emerald Maintenance, Inc. v. United States*, 925 F.2d 1425, 1429 (Fed.Cir. 1991), the Federal Circuit stated that "[t]he purpose of reforming a contract on the basis of mutual mistake is to make a defective writing conform to the agreement of the parties upon which there was a meeting of· the minds."

In this case, Gold Line alleges that DFSC included EPA Clause B19.33 in the fixed price contract "to protect [the government] and awardees from significant market volatility, including fluctuations in the price of raw materials, such as historically volatile crude oil." Compl. at ¶ 17. Plaintiff adds that, in the absence of historic competitive price information for JP–8, it "was forced to rely on a continuing relationship between its raw material costs and the contract's unit prices as finally determined by PMM under Clause B19.33." Compl. at ¶ 30. Plaintiff further asserts that "[a]t the time of contract award, DFSC did not have adequate knowledge about how, if at all, PMM would track as a market indicator for kerosene-based JP–8 on the U.S. Gulf Coast." Compl. at ¶ 31. Gold Line claims that the contracting parties erred in their judgment that the PMM would

track crude oil costs and that the agreement did not allocate this risk of error against Gold Line.

The government states that, in its experience, "crude oil and the refined petroleum product markets do not necessarily move in lock step, or even in the same direction, as to prices." DFSC's Motion at 9. The government adds that "[f]or these types of contracts, the government abandoned crude oil costs as a method of price adjustment in the early 1980s." *Id.* The government explains that "[a]s executed, the contract contains an EPA clause based upon a market price index." *Id.* at 7. The major difficulty with the government's position is that it is in direct conflict with the FAR. For the reasons explained in *MAPCO*, the only legally available types of indexes are those described in FAR § ·16.203–1(b) and (c):

> (b) *Adjustments based on actual costs of labor or material.* These price adjustments are based on increases or decreases in specified costs of labor or material that the contractor actually experiences during contract performance.
>
> (c) *Adjustments based on cost indexes of labor or material.* These price adjustments are based on increases or decreases in labor or material cost standards or indexes that are specifically identified in the contract.

*MAPCO*, 27 Fed.Cl. at 408 (quoting 48 C.F.R. § 16.203–1).

■ There is a legal presumption that the government did not intend to use an index that would violate the law. *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1186 (Fed.Cir.1988). The law, moreover, does not permit the government to benefit from such violation. *See id.* at 1185; *MAPCO*, 27 Fed. Cl. at 408.[8] The risk of an unintentional

---

8. "It is well-settled that applicable provisions of the FAR are incorporated into every federal government procurement contract and have the same effect as if they were set forth in the contract itself." *MAPCO*, 27 Fed.Cl. at 407–408. Moreover, under the "Christian Doctrine," set forth in *G.L. Christian and Assocs. v. United States*, 312 F.2d 418, 160 Ct.Cl. 1, *reh'g denied*, 320 F.2d 345, 160 Ct.Cl. 58, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), the "court may insert a clause into a government

contract by operation of law if that clause is required under the applicable federal administrative regulations." *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed.Cir.1993). The Christian Doctrine applies to mandatory contract clauses reflecting "a significant or deeply ingrained strand of public procurement policy." *Id.* The doctrine also applies "to incorporate less fundamental or significant mandatory procurement clauses if not written to benefit or

failure of a contract term to comply with a legal requirement does not fall solely on the contractor. *Beta Sys., Inc.*, 838 F.2d at 1185. Here, Gold Line has alleged that it did not intend to use an index that would fail to reflect the cost of its crude oil, and the government cannot have intended anything other than what the law requires. As the Federal Circuit held in *Beta Systems*, if a fixed price contract containing an economic price adjustment clause is in violation of the procurement regulations and does not meet the requirement that the selected index approximately tracks the economic changes affecting the contract, reformation is appropriate. *Id.* at 1186. Accordingly, plaintiff's claim for reformation is a claim upon which relief can be granted.

### C. Reformation for Unilateral Mistake

█ As a further alternative, Gold Line alleges a unilateral mistake in its belief about the protection against price fluctuations afforded by its contract and seeks contract reformation to remedy its mistake. Comp. at ¶¶ 63–64. However, the case law is well settled that a party's own unilateral mistake does not entitle that party to contract reformation absent circumstances such as clerical errors by a party. *See Dale Ingram, Inc. v. United States*, 201 Ct.Cl. 56, 74, 475 F.2d 1177 (1973). No such error is present in this case. Accordingly, no relief can be granted on plaintiff's claim for reformation on the ground of unilateral mistake as a matter of law.

### III. Conclusion

For the reasons stated, defendant's Motion to Dismiss is DENIED as to Gold Line's quantum meruit claim and as to its claim for reformation. Defendant's Motion to Dismiss is GRANTED as to Gold Line's claim for

reformation on the ground of unilateral mistake.

protect the party seeking incorporation." *Id.* at 780.

Here, the government asserts that the economic price adjustment clause is not required to be in the contract (3/15/99 Tr. at 32) and then argues that the FAR does not prohibit using an economic price adjustment clause other than the three types set forth in FAR § 16.203–1. 3/15/99 Tr. at 33–34. The court, however, decides that by choosing to use a fixed price contract with an

EPA clause, the government is bound by the relevant FAR provisions. The court incorporates the regulatory provisions governing the EPA clause into the contract by operation of law, on both the ground that the provisions reflect deeply ingrained public procurement policy and also because the provisions are intended to protect the government as well as the contractor against significant cost fluctuations. *See* 48 C.F.R. § 16.203–3.