**WRIGHT RUNSTAD PROPERTIES LIMITED PARTNERSHIP,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 97–27C.

United States Court of Federal Claims.

May 6, 1998.

Bruce P. Babbitt, Seattle, WA, for plaintiff.

Hillary A. Stern, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

## OPINION

MEROW, Judge.

This matter, before the court on cross-motions for summary judgment, involves a lease between the United States General Services Administration ("GSA"), as lessee, and plaintiff, as lessor, for space in plaintiff's building located in Seattle, Washington. The lease requires the government to "pay additional rent for its share of increases in real estate taxes" levied on the building. Near the beginning of the lease term, the city of Seattle built a bus tunnel through the heart of downtown. To help pay for the project, the city levied a special assessment on downtown commercial properties receiving a special benefit from the tunnel, including plain-tiffs. The question presented is whether the lease language quoted above or any other facts in the record obligate GSA to pay its share of the tunnel assessment. For the reasons stated below, it is concluded that GSA is not so obligated. Therefore, defendant's motion for summary judgment is granted and plaintiff's motion is denied.

## I. BACKGROUND

The following facts are not in dispute. On August 30, 1989, GSA, as lessee, and 1111 Third Avenue Limited Partnership ("1111 Third Ave. L.P."), consisting of GRC Properties, 1111 Third Avenue Limited, and Wright Runstad & Co., as lessor, executed a lease for office storage and related space on floors 6–9 of the 1111 Third Avenue Building located in Seattle, Washington. Plaintiff Wright Runstad Properties Limited Partnership ("Wright Runstad") is the successor-in-interest to 1111 Third Ave. L.P.

The lease, drafted entirely by GSA, is for a ten-year term running from January 21, 1990 to January 20, 2000. The annual rent was originally set at $1,233,231. Paragraph 20, "Tax Adjustment (June 1985)," states that "[t]he government shall pay additional rent for its share of increases in real estate taxes over taxes paid for the calendar year in which its lease commences (base year)." Def.'s App. Ex. 1; 48 C.F.R. § 552.270–24 (1989). The clause does not define "real estate taxes." However, on March 13, 1991, nearly nineteen months after the lease was signed, the relevant GSA regional office issued an alternate clause explicitly defining "real estate taxes" as "taxes which are assessed on an ad valorem basis against all taxable real property within the jurisdiction of the taxing authority, without regard to any benefit to the property, and the revenues collected are used by the taxing authority for the purpose of providing general services." Def.'s Resp.App. 2. The alternate clause specifically states that "the Government will not pay special assessments." *Id.*

Paragraph 21 of the lease provides for annual operating cost adjustments to the rent. A copy of the clause is not contained in the record. However, according to plaintiff, the clause obligates GSA to pay adjusted

rent for changes in costs for "cleaning services, supplies, materials, maintenance, trash removal, landscaping, water, sewer charges, heating, electricity, and certain administrative expenses attributable to occupancy." Pl.'s Mot. at 2; *see also* 48 C.F.R. § 552.270–23 (1989). Plaintiff asserts that each year the parties would sign a "Supplemental Lease Agreement" reflecting operating cost adjustments. Murphy Dec. ¶ 4.

During the early years of the lease term, the city of Seattle constructed a tunnel for city buses, referred to as the "Metro Tunnel," through the heart of downtown to alleviate traffic congestion. To help fund the project, the city levied a special assessment of $20 million—about 5% of the total project cost—on all commercial properties within a "Local Improvement District" ("LID"). The LID was comprised of downtown commercial properties receiving a special benefit (*i.e.*, an increase in market value) from the tunnel. The $20 million assessment was allocated to each commercial property in the LID in proportion to the special benefit it received. A study commissioned by the city estimated that the parcel of property located at 1111 Third Avenue would receive a special benefit of $3,451,198.

On January 24, 1992, Kings County, Washington, which includes the City of Seattle, sent 1111 Third Ave. L.P. a bill for $230,-521.08, representing its portion of the Metro Tunnel assessment plus interest to date. The property owner was given the option of paying the assessment on an installment basis or all at once. 1111 Third Ave. L.P. chose the latter and paid the full assessment by check dated March 13, 1992.

In early 1994, 1111 Third Ave. L.P. timely forwarded its real estate tax bills for 1991–1993, including the Metro Tunnel assessment bill, to GSA. By letter dated April 20, 1994, an assistant contract manager for GSA provided Wright Runstad with GSA's calculation of the rent adjustment due under the Tax Adjustment clause. The calculation reflected a $29,386.28 payment from GSA for its share of the tunnel assessment.

According to plaintiff, GSA subsequently executed a "Supplemental Lease Agreement" adjusting the rent for operating costs without disputing the payment of the Metro Tunnel assessment. The only "Supplemental Lease Agreement" included in the record, dated April 7, 1994, reduced the amount of leased space by 221 square feet and made corresponding changes to the rent rate, the base rate for computing operating cost adjustments under Paragraph 21, and the percentage of occupancy used for calculating tax adjustments under Paragraph 20. Murphy Dec. Ex. 3. Nothing in the agreement indicates that the parties intended to address either the propriety of GSA's payment of the Metro Tunnel assessment or the extent of GSA's obligations under the Tax Adjustment clause.

In late 1994, Wright Runstad bought the 1111 Third Avenue Building from its partners. Prior to closing, Wright Runstad requested an "Estoppel Certificate" from GSA. An assistant contract manager for GSA responded that GSA did not sign estoppel certificates. However, she did provide Wright Runstad with a "Lease Status" report stating that "[n]o setoffs or counter claims have been asserted." Nothing in the document indicates that GSA intended to address the Metro Tunnel assessment or the Tax Adjustment clause.

In 1995, Anthony R. Gordon became the GSA contracting officer ("CO") for the lease. He performed an audit and concluded that GSA had erroneously paid the Metro Tunnel assessment. By letter dated October 19, 1995, he informed Wright Runstad that the $29,386.28 payment was in error because GSA "does not pay LID assessments" under the Tax Adjustment clause. He stated that the "erroneous" payment would be deducted from subsequent rent payments unless Wright Runstad refunded the money to GSA. By letter dated January 31, 1996, Wright Runstad contested the CO's decision and asserted that GSA was not permitted to deduct the disputed amount from rent. On February 16, 1996, the CO sent another letter to Wright Runstad stating that it was his "final decision" to deduct the disputed amount from the next rent payment. On January 15, 1997, Wright Runstad initiated this action to recover the deduction. Both parties have moved for summary judgment.

The government contends that it is entitled to judgment as a matter of law because the Tax Adjustment clause does not obligate it to pay the Metro Tunnel assessment. The government reasons that the clause is essentially a Congressional waiver of governmental tax immunity and must therefore be strictly construed. When so construed, defendant asserts, it is clear that Congress did not intend to waive the government's immunity from special assessments like the Metro Tunnel assessment. Furthermore, defendant maintains, the distinction between real estate taxes and special assessments is well recognized and courts have consistently held that a lease obligating the lessee to pay taxes does not require the payment of special assessments. Therefore, defendant reasons, the court should follow the plain meaning of the lease terms and hold the government responsible for increases in "real estate taxes" but not special assessments like the Metro Tunnel assessment.

Plaintiff's position is that the meaning of "real estate taxes" in the Tax Adjustment clause is ambiguous and must be construed against the government as the drafter. With respect to the long line of cases recognizing the distinction between real estate taxes and special assessments, plaintiff responds that the Metro Tunnel assessment is not really a special assessment but a "real estate tax in disguise." Furthermore, when extrinsic evidence is considered to clarify the ambiguous lease language, plaintiff maintains, it becomes clear that the parties intended to make the government responsible for the tunnel assessment. Finally, plaintiff claims that the government cannot retroactively disallow the assessment and that, in light of its previous actions, it should be estopped from asserting that the payment of the assessment was in error.

The court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), and the Contract Disputes Act, 41 U.S.C. § 609 (1994).

## II. DISCUSSION

### 1. Summary Judgment Standards

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to prevail as a matter of law. RCFC 56(c); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material if it could affect the outcome of the case. *Young Enters., Inc. v. United States,* 26 Cl. Ct. 858, 863 (1992). A dispute over a material fact is genuine if, based on the evidence presented, a reasonable factfinder could find for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Where, as here, both parties have moved for summary judgment, the court must evaluate each motion on its own merits. "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir. 1988).

### 2. Applicability of the Intergovernmental Tax Immunity Doctrine

Citing *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), defendant states the general rule that, absent an express Congressional waiver, the Federal Government is immune from state taxation. According to defendant, the language of the Tax Adjustment clause obligating the government to pay increases in real estate taxes is, in effect, a Congressional waiver of the government's tax immunity because the clause was placed in the contract pursuant to procurement regulations, 48 C.F.R. §§ 552.270–24, 570.702–15 (1989); those regulations have the force and effect of law, *G.L. Christian & Assocs. v. United States,* 160 Ct.Cl. 1, 12, 312 F.2d 418, 424, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); and, by statute, the agency must follow the regulations. 41 U.S.C. § 252 (1994). The government notes that Congressional waivers of governmental tax immunity must be strictly construed. *See United States v. City of Adair,* 539 F.2d 1185, 1189 (8th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977). When the Tax Adjustment clause is strictly construed, defendant asserts, it is clear that the government is not responsible

for special assessments like the Metro Tunnel assessment because the clause "did not waive sovereign immunity for special assessments." Def.'s Mot. at 7.

 This line of reasoning is flawed. "[U]nder current intergovernmental tax immunity doctrine the States can never tax the United States directly but can tax any private parties with whom it does business, even though the financial burden falls on the United States, as long as the tax does not discriminate against the United States or those with whom it deals." *South Carolina v. Baker*, 485 U.S. 505, 523, 108 S.Ct. 1355, 1366–67, 99 L.Ed.2d 592 (1988). The Federal Government's tax immunity is not infringed by "a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States." *United States v. Boyd*, 378 U.S. 39, 44, 84 S.Ct. 1518, 1521, 12 L.Ed.2d 713 (1964); *United States v. New Mexico*, 455 U.S. 720, 733–34, 102 S.Ct. 1373, 1382–83, 71 L.Ed.2d 580 (1982); *Alabama v. King & Boozer*, 314 U.S. 1, 8–14, 62 S.Ct. 43, 45–48, 86 L.Ed. 3 (1941); *James v. Dravo Contracting Co.*, 302 U.S. 134, 160–61, 58 S.Ct. 208, 221, 82 L.Ed. 155 (1937). Thus, non-discriminatory real estate taxes levied on Wright Runstad's property do not infringe the government's tax immunity even though the government has agreed to bear the economic burden under the lease because the legal incidence of the taxes falls on Wright Runstad, the owner of the property taxed. *Cf. United States v. California State Bd. of Equalization*, 650 F.2d 1127, 1131 (9th Cir. 1981) ("[T]here is no constitutional violation if the state levies a tax on a lessor to the United States and the lessor recoups this tax payment by raising the lease price."), *aff'd mem.*, 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 157 (1982).

Simply put, governmental tax immunity is not implicated here because the government is not being taxed. The Tax Adjustment clause is not a waiver of the government's tax immunity because the taxes paid under the clause are levied on Wright Runstad's property, not the government's. Accordingly, there is no basis for strictly construing the clause. The government's obligations under the clause must be determined by common law rules of contract interpretation. *See Alvin, Ltd. v. United States Postal Serv.*, 816 F.2d 1562, 1564 (Fed.Cir.1987) ("The government enters into contracts as does a private person, and its contracts are governed by the common law.").

### 3. The Plain Meaning of the Tax Adjustment Clause

 "Contract interpretation begins with the plain language of the agreement." *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed.Cir.1993). "If the provisions are clear and unambiguous, a court will give them their plain and ordinary meaning and will not resort to parol evidence." *Barseback Kraft AB v. United States*, 121 F.3d 1475, 1479 (Fed.Cir.1997). The plain language of the Tax Adjustment clause obligates the government to pay additional rent for its share of "increases in real estate taxes" levied on plaintiff's property. Over a hundred years ago, the Supreme Court recognized the distinction between taxes and special assessments:

Between taxes—or 'general taxes,' as they are sometimes called . . .—and special taxes or special assessments, which are imposed upon property within a limited area for the payment for a local improvement, supposed to enhance the value of all property within that area, there is a broad and clear line of distinction, although both of them are properly called taxes. . . . Taxes proper, or general taxes, proceed upon the theory that the existence of government is a necessity; that it cannot continue without means to pay its expenses; that for those means it has the right to compel all citizens and property within its limits to contribute; and that for such contribution it renders no return of special benefit to any property, but only secures to the citizen that general benefit which results from protection to his person and property, and the promotion of those various schemes which have for their object the welfare of all. . . .

On the other hand, special assessments or special taxes proceed upon the theory

that, when a local improvement enhances the value of neighboring property, that property should pay for the improvement. *Illinois Cent. R.R. Co. v. City of Decatur,* 147 U.S. 190, 197–98 [13 S.Ct. 293, 293–94, 37 L.Ed. 132] (1893) (special tax for local improvement not within statutory exemption from taxation granted to railroad company); *see also Federal Reserve Bank v. Metrocentre Improvement Dist. # 1,* 657 F.2d 183, 186–87 (8th Cir.1981) (citing *Illinois Cent. R.R.,* court held that where a statute waives the government's tax immunity for real estate taxes, "that waiver alone will not extend to special assessments"), *aff'd mem.,* 455 U.S. 995 [102 S.Ct. 1625, 71 L.Ed.2d 857] (1982); *City of Adair,* 539 F.2d at 1188 (similar holding).

Based on this distinction, therefore, other tribunals have consistently held that a lease which obligates the lessee to pay real estate taxes does not obligate the lessee to pay special assessments. *McDaniel Bros. Constr. Co.,* GSBCA Nos. 6973, 7283, 84–2 B.C.A. ¶ 17,497, 1984 WL 13462 (lease obligating GSA to pay increases "in general real estate taxes" did not require payment of special assessment for downtown improvement district), *aff'd on recons.,* 84–3 B.C.A. ¶ 17,683, 1984 WL 13722; *Woodbridge Constr. Corp.,* GSBCA No. 14200, 98–1 B.C.A. ¶ 29,345, 1997 WL 733904 (same language did not require GSA to pay front foot benefit assessment for water and sewer lines benefiting property); *G & A Inc. v. Nahra,* 204 Mich.App. 329, 514 N.W.2d 255 (1994) (tenant's obligation to pay "all of the real property taxes" did not require payment of special assessment for improvement of adjacent off-street parking); *Allstate Management Corp. v. Grand Union Co.,* 142 A.D.2d 344, 535 N.Y.S.2d 779 (N.Y.App.Div.1988) (tenant's obligation to pay increase in real estate taxes did not require payment of special assessment for extension of sewer system); *Crestview Bowl, Inc. v. Womer Constr. Co., Inc.,* 225 Kan. 335, 592 P.2d 74 (1979) (tenant's duty to pay "any increase in taxes" did not require payment of special assessments); *Thompson v. First Nat'l Bank of Hollywood,* 321 So.2d 466 (Fla.Dist.Ct.App. 1975) (tenant's duty to pay "annual taxes" did not require payment of special assessment

for sewer improvements). This rule is also grounded on the theory that "the lessor, as the owner of the reversion, should bear the burden of improvements which benefit the premises, rather than the leasehold." *McDaniel Bros.,* 84–2 B.C.A. ¶ 17,497 at 87,-151.

Exceptions have been recognized when the reasons for the rule do not apply. For instance, where the lease term is perpetual or will outlast the useful life of the capital improvement for which the special assessment is levied, the lessee may be responsible for the assessment since he or she is the sole beneficiary of the improvement. *See Efros v. Russo,* 71 N.J.Super. 602, 177 A.2d 565 (Ct. App.Div.1962) (under lease requiring tenant to pay "all taxes," tenant liable for special assessment to pay for water system where lease term was 75 years and estimated life of water system was 40 years); *McDaniel Bros.,* 84–2 B.C.A. ¶ 17,497 at 87,151 (discussing exception).

The lessee will also be responsible for special assessments which are direct substitutes for general real estate taxes. *Alvin,* 816 F.2d 1562; *S.S. Silberblatt Inc. v. United States,* 888 F.2d 829 (Fed.Cir.1989). Both *Alvin* and *Silberblatt* involved leases between the United States Postal Service, as lessee, and private parties for real property located in California. The leases obligated the government to pay the "general real estate tax bills." In 1978, while the leases were in effect, California adopted Proposition 13 which amended the State Constitution to limit ad valorem real property taxes to one percent of the property's assessed value. The result was an immediate reduction in tax revenue, causing local officials to resort to alternative revenue collection methods such as special assessments and service charges. In *Alvin,* the court determined that the special assessments were funding the same government services paid for by ad valorem real estate taxes before Proposition 13. The court held that the Postal Service's contractual agreement "to pay general real estate taxes requires the payment of those levies that succeeded the general real estate taxes, however these successor taxes are denominated. Such payment reinstates the original

bargain, as it was understood by both the Postal Service and the lessors." 816 F.2d at 1566. In *Silberblatt*, the court determined that the assessments at issue were not in lieu of general real estate taxes and held that the Postal Service was not contractually obligated to pay the assessments. 888 F.2d at 832–33.

■ Neither exception applies in this case. The lease at issue is for a ten-year period which expires on January 20, 2000. Since there is no evidence that the useful life of the Metro Tunnel will expire before that date, plaintiff will soon be able to enjoy, either through increased rent or otherwise, the estimated $3.45 million benefit conferred upon the 1111 Third Avenue parcel by the tunnel.

Furthermore, the tunnel assessment is not, as plaintiff asserts, a "real estate tax in disguise." On the contrary, since the assessment was a one-time charge levied against only those properties specially benefitting from the tunnel, and since the purpose of the assessment was to pay for the tunnel rather than general government services previously funded by ad valorem real estate taxes, the Metro Tunnel assessment exemplifies the very definition of a special assessment. *See McDaniel Bros.*, 84–2 B.C.A. at 87,151 ("special assessments are charged to particular parcels of real property within designated districts to recover the benefits conferred upon that property by specific local improvements of a public nature"); *Illinois Cent. R.R.*, 147 U.S. at 197, 13 S.Ct. at 293–94 (special assessments "are imposed upon property within a limited area for the payment for a local improvement, supposed to enhance the value of all property within that area").

Accordingly, the plain meaning of the Tax Adjustment clause is dispositive. The clause unambiguously requires GSA to pay its share of increases in "real estate taxes." Since it is well established that special assessments are distinct from real estate taxes, and since the Metro Tunnel assessment is a special assessment, GSA is not obligated to pay the assessment. *Cf. Woodbridge*, 98–1 B.C.A. at 145,908 ("Reading the contract plainly, it does not require GSA to increase its rent payments based upon front foot benefit assess-

ment charges because those charges are not general real estate taxes.").

### 4. Extrinsic Evidence

■ In an effort to avoid the plain meaning of the Tax Adjustment clause, plaintiff offers evidence of an alleged trade practice of passing special assessments on to tenants and of government conduct allegedly indicating that the government interpreted the clause as requiring the payment of special assessments. As stated above, however, extrinsic evidence "may not be considered unless an ambiguity is identified in the contract language. Outside evidence may not be brought in to create an ambiguity where the language is clear." *City of Tacoma v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994) (internal citation omitted); *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987). "To permit otherwise would cast 'a long shadow of uncertainty over all transactions' and contracts." *McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996) (quoting *Trident Ctr. v. Connecticut Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir.1988)). Since the Tax Adjustment clause plainly does not require GSA to pay special assessments like the Metro Tunnel assessment, the extrinsic evidence offered by plaintiff may not be considered.

■ Furthermore, even if it were considered, the extrinsic evidence would not create a genuine issue of material fact. Plaintiff first asserts that it is the custom and practice in the industry to pass charges such as the Metro Tunnel assessment on to tenants. However, in support of this assertion, plaintiff offers only conclusory statements from two affiants that in "other leasing of downtown properties" the practice was to pass special assessments on to tenants through "normal real estate tax pass-through clauses" or as operating costs. Not one specific instance where this alleged practice was followed has been identified. "The existence of a trade practice can only be proven by instances of actual practice and not by the opinion of a witness alone." *Sinclair Oil Corp.*, EBCA Nos. 416–8–88, 417–8–88, 90–1 B.C.A. ¶ 22,462 at 112,775, 1989 WL 140575, *mot. for recons. denied*, 90–2 B.C.A. ¶ 22,827,

1990 WL 32049; *Bruce Andreson Co., Inc.,* ASBCA Nos. 29412, 32247, 89–2 B.C.A. ¶ 21,-872 at 110,030–31, 1989 WL 46861. Furthermore, not one example of the clauses allegedly used in the practice has been presented, nor has plaintiff otherwise shown that the clauses used are similar to the Tax Adjustment clause. To be a useful tool in contract interpretation, the trade practice must apply words similar to those being interpreted. The mere fact that "things are not customarily done in the manner called for by the contract" is of no assistance. *Western States Constr. Co., Inc. v. United States,* 26 Cl.Ct. 818, 824 (1992). In short, nothing in the record could lead a reasonable factfinder to conclude that the parties were aware (or should have been aware) of a trade practice of construing "real estate taxes" to include special assessments at the time they executed the lease.

Next, plaintiff asserts that the government's decision not to use the alternate clause explicitly stating that the government would not pay special assessments, its initial decision to pay the Metro Tunnel assessment, its signing of the Supplemental Lease Agreement without objecting to the assessment, and its statement in the Lease Status report that "[n]o setoffs or counter claims have been asserted" demonstrate that the government interpreted the clause as requiring the payment of the assessment.

However, the claim that GSA could have used the alternate clause is unfounded because the clause was not issued until March 13, 1991, nineteen months after the lease was signed. Likewise, the fact that GSA personnel initially paid the assessment is immaterial because it does not imply that an authorized GSA contracting official knowingly interpreted the Tax Adjustment clause as requiring the payment of special assessments. "When the canon of construction speaks of giving weight to the 'parties' ' own interpretation, it refers, so far as the Government is concerned, to a responsible officer assigned the function of overseeing the essentials of contract performance—not to any federal employee or officer whose work happens to be connected with the contract." *Deloro Smelting & Refining Co. v. United States,* 161 Ct.Cl. 489, 494–95, 317 F.2d 382, 385–86 (1963) (contractor's reliance on payments to support its interpretation of contract did not "advance its cause" because "[a]gency fiscal or finance offices are not ordinarily a significant part of the process of negotiating and performing contracts"); *Jansen v. United States,* 170 Ct.Cl. 346, 354–55, 344 F.2d 363, 369 (1965) (contract payments not dispositive of parties' intentions without showing that CO or anyone else "thoughtfully considered the payment formula" and because "the payments may have been made as a matter of routine by the finance office"). Finally, nothing in the Supplemental Lease Agreement or the Lease Status report even relates to the intended meaning of "real estate taxes" in the Tax Adjustment clause. There is simply no evidence in the record that an authorized GSA official intended to construe the clause as requiring the payment of special assessments.

**5. The Government's Right of Recoupment and Equitable Estoppel**

Plaintiff's final contention is that GSA may not retroactively disallow previously allowed costs and that, in light of its earlier actions, the government should now be estopped from asserting that the payment of the Metro Tunnel assessment was erroneous.

 This argument lacks merit. "It is a well-settled principle that the Government has inherent authority to recover sums illegally or erroneously paid, and that it cannot be estopped from doing so by the mistakes of its officers or agents." *Aetna Cas. & Sur. Co. v. United States,* 208 Ct.Cl. 515, 520, 526 F.2d 1127, 1130 (1975), *cert. denied,* 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976); *American Nat'l Bank & Trust Co. v. United States,* 23 Cl.Ct. 542, 547 (1991); *Fansteel Metallurgical Corp. v. United States,* 145 Ct.Cl. 496, 499–501, 172 F.Supp. 268, 270–71 (1959). Because the Tax Adjustment clause obligated GSA only to pay increases in real estate taxes, the payment of the Metro Tunnel assessment was erroneous. Consequently, the government has not only the right but the duty to recover the payment and it cannot be estopped from doing so. *Id.*

828

## CONCLUSION

Based on the above, it is determined that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. Therefore, defendant's motion for summary judgment is **GRANTED**, and plaintiff's motion is **DENIED**. The Clerk is directed to dismiss the complaint. Each party must bear its own costs.