**BARRETT REFINING CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 96–15C, 96–724C, 96–725C, 96–726C and 97–321C.**

United States Court of Federal Claims.

Filed Oct. 2, 1998.

Released for Publication [1] Oct. 16, 1998.

James D. Bachman, Washington, D.C., for plaintiff.

Sheryl L. Floyd, U.S. Department of Justice, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger and Director David M. Cohen, U.S. Department of Justice, Washington, D.C., and Karen Schools, Defense Logistics Agency, Fort Belvoir, Virginia, of counsel, for defendant.

OPINION

BRUGGINK, Judge.

Plaintiff Barrett Refining Corporation ("Barrett") seeks damages resulting from the use of an unauthorized economic-price-adjustment ("EPA") clause in its contracts to

---

**1.** This opinion was originally issued under seal pursuant to the concerns of industry witnesses. The parties were given until October 14, 1998 to notify the court whether part or all of the opinion should not be released for publication. The parties have no objection to full publication.

supply jet fuel to the Defense Fuel Supply Center ("DFSC" or "agency").[2] The parties agree that the clauses are unenforceable and that the plaintiff is entitled to recover on a *quantum valebant* theory. The issues before the court, therefore, are the fair market value of the fuel delivered by plaintiff and whether plaintiff was under-compensated for the fuel it delivered. Plaintiff further seeks damages from an allegedly illegal termination for default on a separate contract. Trial was held in Washington, D.C., on July 27–30, 1998.

## BACKGROUND

Barrett was a small, family-owned oil refining business headed by its president, John A. Barrett. The Barrett family has been drilling in Oklahoma since the mid–1920s. John A. Barrett is an active member of the Potawatomi Indian tribe in Oklahoma. The Barrett family bought a refinery in Thomas, Oklahoma, in 1985, forming Barrett. The Thomas refinery was specifically designed to manufacture jet fuel. Its location in Oklahoma gave the refinery a transportation advantage over other suppliers to military bases in Oklahoma. The Thomas refinery was profitable, leading Barrett to purchase a second refinery located in Vicksburg, Mississippi, in 1991. From 1985 through 1995, Barrett supplied military jet fuel to the United States via DFSC. For each of the disputed contracts, Barrett was qualified as a small disadvantaged business ("SDB") concern.[3]

### A. *Types of Jet Fuel*

There are three types of military jet fuel at issue under Barrett's contracts with

DFSC: JP–4, JP–5, and JP–8. JP–4 is a military jet fuel that consists of approximately seventy percent naphtha, a component of gasoline, and thirty percent kerosene. It was widely in use by the military prior to 1994. In 1993, the agency began purchasing JP–5 and JP–8 in lieu of JP–4 because the former are kerosene-based jet fuels with more desirable properties than JP–4.[4] The differences in processing arise by virtue of the different distillation temperature ranges of the fuels. JP–4, because of its broad distillation range, is less expensive to manufacture than JP–5 and JP–8.[5]

The commercial analog to JP–8 is Jet–A. There was some dispute as to the similarity between the two fuels. According to Mr. Barrett, JP–8 is more expensive to manufacture than Jet–A, because Jet–A does not have to meet the same stringent government specifications as JP–8. According to C. Alan Stevens—the former president of a refinery that competes with Barrett and an expert in management and operation of a refinery and marketing of refined petroleum products—JP–8 and Jet–A are essentially the same products. They are manufactured in the same tank and meet all the necessary specifications to be sold as either Jet–A or JP–8. Although the court recognizes that there may be slight differences, it finds that the two products, in the context of determining fair market value, are equivalent.

### B. *The Contracts*

There are four contracts at issue for which plaintiff seeks to recover fair market value

---

2. The Defense Fuel Supply Center has since been renamed the Defense Energy Support Center.

3. An SDB concern is defined in the solicitations as "a small business concern, owned and controlled by individuals who are both socially and economically disadvantaged.... In order to be eligible for preferential consideration ... SDB concerns must supply product from an SDB manufacturer." *E.g.*, Def.'s ex. 5, at 125. A small business concern is defined in the solicitations as "a concern ... that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the size standards in this solicitation." *Id.*

4. JP–5 and JP–8 have lower freeze points and higher flash points than JP–4. JP–4 flashed at room temperature and thus had to be handled with care. These differences in properties made the JP–5 and JP–8 safer to handle, especially in closed environments such as aircraft carriers. JP–5 differed from JP–8 only in that it had a slightly higher flash point.

5. The increased cost is partly due to the naphtha byproduct that results from refining JP–5 or JP–8. Because there is no naphtha component to either JP–5 or JP–8, any naphtha produced during distillation is not used in the jet fuels. Barrett did not have the capacity to utilize naphtha in its own refineries.

for fuel delivered. The quantities of fuel delivered are not in dispute. These con- tracts are summarized in the following chart:

| Contract | Fuel | Base Month | Delivery Period | Qty (gals) Delivered | Total Payment |
|---|---|---|---|---|---|
| DLA600–91–D–0512 ("contract 0512") | JP–4 | July 1990 | Apr. 1991— Mar. 1992 | 42.519M | $25.862M |
| DLA600–92–D–0505 ("contract 0505") | JP–4 | August 1991 | Apr. 1992— March 1993 | 57.501M | $35.249M |
| DLA600–93–0577 ("contract 0577") | JP–4 | February 1993 | Oct. 1993— Sep. 1994 | 69.417M | $37.396M |
| | JP–5 | February 1993 | Oct. 1993— Sep. 1994 | 5.778M | $3.411M |
| | JP–8 | February 1993 | Apr. 1994— Mar. 1995 | 17.127M | $9.031M |
| DLA600–94–D–0492 ("contract 0492") | JP–5 | August 1993 | Oct. 1994— Sep. 1995 | 4.490M | $2.901M |
| | JP–8 | August 1993 | Oct. 1994— Sep. 1995 | 47.259M | $26.880M |

The delivery terms of each contract were free on board ("f.o.b.") refinery, i.e., the pricing did not include delivery, although, as explained below, delivery costs ultimately figured in the determination of which bids were accepted. Each of the four contracts contained an EPA clause. The language of the clause in all four contracts is substantially the same; only the formulas used to calculate the reference prices differ.[6]

In *MAPCO Alaska Petroleum, Inc. v. United States,* 27 Fed.Cl. 405 (1992), this court held that a similar EPA clause using the Petroleum Marketing Monthly ("PMM") index was not specifically authorized by the Federal Acquisition Regulation ("FAR"). *See id.* at 408–11. The FAR limited the use of EPA clauses to adjustments based on established prices, adjustments based on actual costs of labor or material, or adjustments based on cost indexes of labor or

material. *See* 48 C.F.R. § 16.203–1 (1986). The court noted that the PMM index did not represent an "established price" as defined by the FAR. *See MAPCO,* 27 Fed.Cl. at 410.

## C.  *Pricing Jet Fuel*

### 1.  *EPA Clauses*

The Government concedes that the pricing mechanisms used in the contracts at bar were unauthorized. It therefore does not dispute the need to price the fuel deliveries on a *quantum valebant* basis. It is necessary, however, to explain how the clauses operated in order to frame up Barrett's claim in its entirety.

Each EPA clause in the contracts was tied to certain published price indices, the movements of which were used as the basis for

---

**6.** All the formulas considered varied factors in determining a reference price. These factors included multiple markets in which the fuel may be used and the composition of the fuel. For example, for JP–4 under the 0505 contract, the formula for calculating the final reference price was: 0.05 × (PAD I Kero-jet) + 0.25 × (PAD III Kero-jet) + 0.16 × (PAD I Unleaded) + 0.54 × (PAD III Unleaded). This formula reflected the 3:7

ratio of kerosene to gasoline for JP–4, and two geographic markets, as indicated by the Petroleum Administrative District ("PAD") designations.

PADs are classified by the DOE Energy Information Administration. PAD I is the eastern seaboard, including New York and New Jersey. PAD II is the midwestern states, including Michigan, Ohio, and Oklahoma. PAD III is the Gulf Coast, which includes Texas and Louisiana.

recalculating the unit price on a monthly basis. Each clause contained two separate adjustment calculations: an interim adjustment and a final adjustment. The final adjustment, which typically was made three months after the fuel was delivered, was tied to the PMM index. This index, published by the Department of Energy ("DOE"), represented a compilation of actual prices paid for petroleum products for the month. Because the PMM data typically did not become available until three months after the month in question, an interim pricing mechanism was used. The interim adjustment was tied to the Oil Price Information Service ("OPIS") Commercial Airline Jet Fuel Range Index for kerosene-based jet fuel and the OPIS Petroleum Administrative Districts ("PAD") Reports for regular unleaded gasoline.[7] The clause thus set up a dual price-adjustment system whereby contractors were paid an initial sum under one calculation until a permanent determination could be made. If an underpayment resulted, the government paid the balance; if an overpayment resulted, the government either received a refund or adjusted the next payment accordingly.

Testimony of commercial jet-fuel consumers, refiners, and experts established that there are three sources of published indices pertaining to the refined-products market: PMM, OPIS, and Platt's Oilgram. Both OPIS and Platt's Oilgram are industry publications that report their own indices regarding petroleum product prices.

With regard to aviation fuels, the PMM report, as described above, uses actual sales data reported by the petroleum industry to report average prices for aviation gasoline, kerosene-type jet fuel, and kerosene.[8] Average prices are reported monthly on a three-month delay and are categorized by state and

by PAD. Average prices are reported for sales to end users and for sales for resale. The PMM report does not differentiate between types of kerosene-based jet fuels or between military and commercial transactions. It also does not differentiate between contracts with different delivery terms. Thus, some prices used to calculate the PMM index may include the transportation costs to the customer and some may not. According to Dr. John Cook, Director of the Petroleum Marketing Division of the DOE's Energy Information Administration, the PMM is not intended to be an index that is used for setting prices; rather, its primary function is to provide data to government agencies and legislators for use in policymaking decisions.[9]

OPIS publishes two indices for aviation fuel: the OPIS Contract index and the OPIS Spot index. According to Ben Brockwell, the editor of OPIS, the indices are determined by surveying sellers and purchasers at locations around the country. The Contract index reflects refineries' posted prices at airports around the country. According to Mr. Brockwell, these posted prices are akin to a manufacturer's suggested retail price for consumer goods. The second type of index, the Spot index, reflects the market for spot sales of petroleum products, typically through fuel brokers and traders.[10] The OPIS Spot index reports data by PAD and by airport.[11] The OPIS Contract index began in 1981; the OPIS Spot index began in 1986.

Platt's Oilgram is a similar publication to that of OPIS. It contains a spot index that is grouped by regions corresponding to PADs. For example, the Gulf Coast market region corresponds to PAD III and includes Houston, Texas.

7. Each contract referred to particular PADs for interim pricing.

8. According to Dr. John Cook, Director of the Petroleum Marketing Division of the DOE Energy Information Administration, petroleum sellers and resellers are obligated by law to report actual sales prices to the DOE. Participation is near 100%.

9. Some of the entities that use PMM data are the U.S. Congress, the General Accounting Office,

the Bureau of Labor Statistics, and various state agencies.

10. According to J. Harold Ayres, a representative of Chevron U.S.A., a major refiner, only brokers or trading companies purchase fuel at spot index prices.

11. The spot prices by airport reflect the spot prices for a given region plus transportation costs from the center of that region to the particular airport.

### 2. Pricing Jet Fuel in Commercial Contracts

The airline industry, the largest consumer of jet fuels, priced jet fuel using two different methods in the 1980s. According to Robert Sturtz, Director of Petroleum Administration for United Airlines, prior to 1983 most airlines relied upon the airport prices posted by refineries. Starting in 1983, airlines began using a published spot index at a certain location plus a premium that would include transportation to the airport. For example, an airline would negotiate a term contract with a refinery, f.o.b. into storage,[12] for the supply of Jet–A to Newark International Airport with the price tied to Platt's Oilgram Spot index for New York Harbor plus a premium of 2.5 cents per gallon. This premium would represent transportation costs to Newark Airport and a margin for the refinery. The price would be determined by averaging the reported spot prices for the week preceding the delivery date and adding the premium. According to the testimony of numerous airline representatives, the PMM index was never used to set prices.

### 3. Contracts with DFSC

DFSC is a major purchaser of jet fuel. For the years at issue, its demand represented over fourteen percent of the nation's jet-fuel supply. Unlike the commercial jet-fuel market, the DFSC purchases jet fuel using a markedly different evaluation and pricing mechanism. A solicitation is issued disclosing estimated total quantities, estimated quantities by region, estimated quantities by location, delivery terms by location (usually f.o.b. refinery), and pricing methodology. A set-aside quantity also is identified for each location for use in distributing contracts under certain socioeconomic programs.

Bidders are instructed to bid based on quantities and delivery terms for a given month predating the solicitation for which the market prices are already known.[13] This month is referred to as the base reference month. Because bids are not submitted by end location, the agency evaluates all bidders for all locations to isolate the lowest cost solutions for each location at which fuel is needed. The DFSC takes all the bids and prepares a bid-evaluation model ("BEM") that calculates the "laid-down" price for each bidder at each location. The laid-down price represents the total cost to the government of procuring jet fuel for a certain destination. Thus, where a bid is for delivery at the refinery, DFSC calculates transportation costs from the refinery to the final destination and those costs are added to the bid.

In addition, as a means of checking the general validity of bids, the agency develops internally an estimated range of what it believes are market prices. Bidders submitting the lowest price as determined in this way are then presumptively assigned quantities for specific locations based on the quantities required and the quantities bid upon.

Certain socioeconomic considerations are then taken into account, however. There are two types that are relevant here:[14] (1) partial set-asides for small business concerns with preferential consideration for SDB concerns (clause I237.06); and (2) evaluation preferences for SDB concerns (clause I237.05). The preferential-consideration program considers eligible concerns for the set-aside quantities identified in the solicitation in three stages. These programs operate with a complexity that would have impressed Rube Goldberg. First, SDBs are considered for set-aside quantities if their laid-down prices are within ten percent of the highest assigned laid-down price for non-set-aside quantities. Second, small business concerns, including SDBs, are considered for set-aside quantities on a negotiated basis. Third, if

---

12. According to the testimony, many contracts would be entered on delivery terms of either f.o.b. into pipeline, f.o.b. into storage, or f.o.b. out of storage. The premiums would reflect the amount of transportation for which the refinery was responsible.

13. The contract award prices therefore do not reflect the market as of the date of award, but rather a starting point that is typically six months prior to the award date. Offerors were aware of the evaluation mechanism at the time they submitted their bids.

14. Barrett was not qualified under the set-aside program of section 8(a) of the Small Business Act, 15 U.S.C. § 637(a) (1994).

set-aside quantities are not assigned to any small businesses which are within ten percent of the highest assigned laid-down price, the quantities are offered to small business concerns which agree to provide quantities at the highest assigned laid-down price.

Once all small business concerns are considered under the preferential-consideration program, the agency implements the evaluation-preferences program. Implementation is not limited to set-aside quantities. At this point, all quantities and all bidders that have not been awarded are considered.[15] The program requires the agency to add a factor of ten percent to all offers except those made by SDB concerns, provided they have not waived entitlement to an evaluation preference. After this factor is inserted, remaining quantities are awarded to the bidders with lowest laid-down prices including the evaluation-preference factor at their bid price. The net result is that an SDB can win an award in the following situations: it may win an award because it has the lowest laid-down price regardless of any evaluation preference; or the SDB can win an award despite having a laid-down price that is up to ten percent higher than the lowest laid-down price. The difference between the SDB's winning laid-down price and the lowest laid-down price thus varies depending on the participants, but never exceeds ten percent.

### E. Termination for Default: Contract 0518

On August 29, 1995, Barrett entered into a contract for the supply of jet fuel to the agency that was similar to the four previously-described contracts. By contract number SPO600–95–D–0518 ("contract 0518") the agency procured quantities of JP–5 and JP–8 from Barrett for the period beginning on October 1, 1995, and ending on September 30, 1996. Although contract 0518 contained a similar EPA clause to the one used in the other contracts at issue, B19.33, the PMM

was not used for the determination of the unit price. The contract referred to a Platt's Oilgram spot index or an OPIS spot index, depending on the location to which the fuel was delivered. Contract 0518 called for fuel to be delivered at Barrett's Thomas refinery.

On January 26, 1996, the agency issued a cure notice citing a prospective failure to deliver JP–5 and JP–8 beginning January 30, 1996. It is unclear whether any representative of Barrett responded to that cure notice. On March 2, 1996, an inventory management specialist recommended termination of contract 0518 based on Barrett's failure to deliver on six separate orders for JP–5 and JP–8 in February 1996. On March 26, 1996, Barrett proposed delivering JP–8 to Altus Air Force Base under the contract by using a competitor's refinery. This proposal was rejected.

On June 13, 1996, the contracting officer partially terminated contract 0518 for default based on Barrett's failure to deliver over 11,449,456 gallons of JP–8 and 962,508 gallons of JP–5.[16] Barrett delivered 719,779 gallons of JP–8 and 263,757 gallons of JP–5 in December 1995 and was paid for those quantities. No other fuel was delivered under contract 0518. Barrett cited its financial situation as an excuse for its failure to perform. The agency did not accept this explanation.

### F. The Claims and Complaints

In a series of letters dated in late 1995 and early 1996, Barrett submitted a number of certified claims to the contracting officer seeking damages resulting from DFSC's use of an unauthorized pricing clause under contracts 0492, 0577, 0505, and 0512. The contracting officer denied all of the claims. In two letters dated May 15, 1996, the contracting officer denied some of the claims, but conceded that the EPA clauses incorporated in the contracts used price indicators that

---

**15.** The quantities previously assigned, but not awarded, in the first run of the BEM are reevaluated using the evaluation preference.

**16.** On February 12, 1996, Barrett filed for bankruptcy protection. Pursuant to the automatic stay in that proceeding, the agency was precluded from terminating its contract with Barrett.

On May 21, 1996, the bankruptcy court granted the agency's request for relief from the automatic stay, allowing the agency to terminate the contract with Barrett. In addition, the agency put an administrative hold on over $960,000 due to the government for price adjustments for previously delivered fuel.

were not specifically authorized by regulation. She asserted that Barrett was not damaged by use of use of the unauthorized clauses, however, and denied the claims.

Barrett's claims are spread over five complaints, which, in sum, seek two remedies: (1) recovery of fair market value for fuel it delivered to the government under contracts using an admittedly unauthorized EPA clause; and (2) damages arising from the improper termination of contract 0518 for default. The second amended complaint in case number 96–15C alleges that, because the EPA clauses in contracts 0577 and 0492 were illegal, Barrett is entitled to *quantum valebant* for fuel delivered under contract 0577 and for fuel delivered from October 1994 to June 1995 under contract 0492. The government has filed a counterclaim alleging that plaintiff owes it $966,388.80 related to final price adjustments under the contracts. Complaint number 96–725C covers the price-adjustment amount that is the subject of the counterclaim. Plaintiff has also filed a related complaint in case number 96–724C, covering fuel delivered between July 1995 and October 1995 under contract 0492, and in case number 97–321C, covering fuel delivered under contracts 0505 and 0512. Complaint 96–726C alleges that the termination of contract 0518 for default was improper because it was the direct result of improper price adjustments under contract 0492. It claims that, but for the agency's misuse of the EPA clauses in the earlier contracts, it would not have been in financial straits and thus would have been able to perform contract 0518.

## DISCUSSION

The government does not dispute that the EPA clauses used in contracts 0505, 0512, 0577, and 0492 were not specifically authorized by the FAR and are thus unenforceable under the contracts. Recovery under any of the complaints, however, depends on whether Barrett received fair market value for the

fuel delivered under contracts 0505, 0512, 0577, and 0492.[17]

■ Where the price term of a contract is invalid. the contractor is entitled to recovery on a *quantum valebant* basis for the fair market value of goods delivered.[18] *See United States v. North Am. Transp. & Trading Co.,* 253 U.S. 330, 335, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1154–55 (Fed.Cir.1983) (citing *Cities Serv. Gas Co. v. United States,* 205 Ct.Cl. 16, 500 F.2d 448, 457 (1974) (*Cities I*)). Such recovery is not determined under the contracts as written, but rather under an implied-in-fact contract that the agency will pay for goods delivered, accepted, and used. *See North Am. Transp.,* 253 U.S. at 335, 40 S.Ct. 518. Value is determined in "the marketplace of the property sold," and is not based on the contractor costs or on a reasonable rate of return for the contractor. *Cities I,* 500 F.2d at 457 (citing *North Am. Transp.,* 253 U.S. at 335, 40 S.Ct. 518).

■ A preliminary issue that arises in determining fair market value is whether to take into account the fact that the prices initially struck between Barrett and the agency in these contracts reflected Barrett's SDB status. Strictly speaking, some of the prices were not truly fair market value, if that is defined in terms of completely open markets and competition. To a large extent, the specific prices per gallon were frequently slightly higher than they would have been in the absence of SDB preference factors. Does the court take that into account in putting together a fair market value prompted by *quantum valebant* considerations?

There is one Federal Circuit decision that, although not directly on point, plainly has relevance. In *Urban Data Systems,* the court indicated that advantages that accrue to bidders with special status in the federal procurement process should be considered when determining fair market value. *See*

<hr>

17. Barrett asserts that the termination was improper because its inability to perform resulted from underpayments precipitated by the agency's improper price adjustments on contract 0492. It does not allege damages from use of the EPA clause in contract 0518.

18. Although plaintiff's complaints seek damages on a *quantum meruit* basis, the difference between the two bases is insignificant here. *See Urban Data Sys., Inc. v. United States,* 699 F.2d 1147, 1154–55 n. 8 (Fed.Cir.1983).

*Urban Data Sys.,* 699 F.2d at 1155. In that case, the petitioner was a small business, as defined by section 8(a) of the Small Business Act, that entered a subcontract with the Small Business Administration for services. After declaring the price term of the contract unenforceable, the Federal Circuit indicated that Urban Data Systems' status under the 8(a) program had to be considered in determining fair market value, without giving any precise guidance as to how that was to be done. *See id.*[19]

The government argues that the distinctions between the Section 8(a) program and the SDB program preferences utilized here dictate a different result. This court disagrees. Although the court recognizes that the preferential consideration and evaluation preference used in the instant contracts are different from the 8(a) program discussed in *Urban Data Systems,* the Federal Circuit's observation is still applicable here. The court must consider factors that are unique to the government procurement of jet fuel in its determination of the relevant market.

Moreover, it would be unrealistic to assume either that the marketplace for jet fuel did not adjust itself to the sheer volume of DFSC purchases, or that such adjustments are made in ignorance of the dynamic of the government's preference programs. In addition, DFSC evaluates offers by analyzing the laid-down price of fuel under each offer. This enables offerors with a transportation advantage to bid slightly higher and still compete with large refiners who lack a transportation advantage. Thus, the prices awarded may depend on the location of the destination for the fuel. In other words, in this case the "marketplace of the property sold" is particular to the market created by the DFSC's purchases of military fuel. The best way both to capture that market and to preserve preferences is to begin with the bargain the parties themselves struck. Doing so focuses the inquiry where it belongs—on the market for military jet fuel—and it has the advantage of neither depriving plaintiff of the advantage it initially bargained for, nor of giving it an artificial advantage that has no connection to market dynamics.

These factors lead the court to reject any approach that does not begin with the bargain the parties initially struck. As the Federal Circuit said in *Urban Data Systems* in remanding to the General Services Board of Contract Appeals, "[i]n similar circumstances the Court of Claims noted that '[n]o better answer [to the question of fair compensation] can be given than what the parties agreed upon.'" 699 F.2d at 1155–56 (second and third alterations in original) (quoting *Pacific Maritime Ass'n v. United States,* 123 Ct.Cl. 667, 677, 108 F.Supp. 603, 607 (1952)). This approach, therefore, rejects in part both parties' valuation approaches to the extent they are disconnected to the original contract prices. Doing so, however, does not fix prices for fuel actually delivered. The price of jet fuel fluctuates and the contract price fixed value only at a time some months before delivery actually commenced. It becomes necessary, therefore, to determine prices at the particular time of delivery. A choice in methodology immediately presents itself. Are prices recalculated for each month's deliveries without reference to the base price, or is the base price the beginning point from which to make adjustments? The court elects the latter method, as it is clearly the only means of preserving some plausible connection to a market affected by preferential pricing, and it is plainly the most simplified means of reflecting the unique aspects of sales to the DFSC in general.

The court, therefore, will evaluate the parties' competing views as means of assisting in calculating fair market value as of the dates of particular sales, but with the proviso that the beginning point is the contract price. Although they take different approaches, each involves some level of approximation. As Judge Lloyd Fletcher of the Court of Claims counseled:

> '[M]arket value' is at best an approximation which can almost never be ascertained with mathematical accuracy....

19. Because neither the contracting officer nor the General Services Board of Contracting Appeals had issued a decision on the amount of compensation owed to the contractor under *quantum valebant,* the Federal Circuit had no record before it on which it could act. *See Urban Data Sys.,* 699 F.2d at 1155.

. . . .

The fact, however, that a valuation reached has in it baffling elements of speculation and surmise does not mean that it should not be employed. One guess may be better than another guess, since not all guesses have in them the same element of intelligence. The realization that a considerable amount of conjecture is involved should not paralyze the function of deciding, but it should induce humility. Dogmatism is clearly out of order in a modern valuation case.

*Cities Serv. Gas Co. v. United States,* 217 Ct.Cl. 590, 597, 580 F.2d 433, 437–38 (1978) (*Cities II* ).

### Plaintiff's Methodologies

Plaintiff asserts that fair market value should be determined using three approaches. The first, applied to contracts 0505 and 0512 (the JP–4 contracts), involves considering its losses associated with operating its Vicksburg, Mississippi, refinery, as verified by the market range developed by the agency in evaluating bids. That approach essentially uses the market range as collateral support for recovering approximately three cents per gallon for the Vicksburg facility. The second approach, applied to contracts 0577 and 0492, uses a modified EPA clause with an OPIS Contract index instead of the PMM index. The government responds that both of these approaches are defective. It challenges the first because neither operating loss nor the agency's market range is directly relevant to, or helpful in, determining fair market value. It challenges the second approach because the plaintiff has not proven that the OPIS Contract index reflects the market for jet fuel. Plaintiff's third methodology appeared immediately before trial. In it, Barrett proposes to use the government's independent calculations of fair market value, and then to supplement those figures with a fixed premium of ten percent to account for its status as an SDB. Defendant objects to this approach as improper and not reflective of fair market value.

■ Plaintiff's loss-based approach for the Vicksburg facility is a non-starter. It incorrectly assumes that a reasonable return on investment is a factor in determining fair market value. However, value based on *quantum meruit* and, by analogy, on *quantum valebant,* "is not based on costs nor a reasonable return on investment of the seller, but on the reasonable value in the marketplace of the property sold." *Cities I,* 500 F.2d at 457 (citing *North Am. Transp.,* 253 U.S. at 335, 40 S.Ct. 518). This must be the case; otherwise, inefficient producers would be rewarded. Nor is it relevant that the market ranges used by the agency in evaluating bids correspond in a general way to the loss-based calculations. The market range appears in the agency's price negotiation memorandum. It is an estimated range determined by agency procurement personnel prior to the solicitation and is used, according to N.J. McGuire, the contracting officer, to determine negotiating objectives. According to Ms. McGuire, the bids were evaluated against the market range as a check to measure whether the offers represented a fair and reasonable price. Although the range is hopefully reflective of actual prices, Barrett has not provided any support for selecting the upper end of the range as conclusive of fair market value. Thus, plaintiff's approach to determine the fair market value of jet fuel delivered in contracts 0505 and 0512 is untenable.[20]

■ Plaintiff's second approach, offered for contracts 0577 and 0492, calculates fair market value by adjusting the original contract price with a modified EPA clause, using the OPIS Contract index instead of the PMM index. The OPIS Contract index is an average based on a survey of refiner posted prices at various locations. This approach is flawed because it relies on a price index that is not reflective of market movement. According to Mr. Sturtz, rack prices, as reflected on a posted-price index, are

---

**20.** Furthermore, the fact that two approaches are used to determine fair market value shows the weakness in plaintiff's approaches. This was further evident during trial when plaintiff's second approach, when applied to contracts 0505 and 0512, showed no difference between what plaintiff was paid and "fair market value."

sometimes used as a starting point for negotiations in determining the final unit price in large volume jet-fuel contracts.[21] Such contracts, however, set prices based on a posted price less a negotiated discount. Plaintiff was unable to present any evidence of use of a posted-price index, such as the OPIS Contract index, in the jet-fuel industry to set contract prices during the period between April 1991 and September 1995.[22] Furthermore, even if rack price indices were used in the industry, changes in those indices, standing alone, would not reflect market changes, because the market movement would be reflected in the negotiated discount from the posted price, rather than changes in the posted price itself.

Plaintiff's alternative proposal—based on the government's approach plus ten percent—is rejected for two reasons. As explained below, the court has not fully adopted the government's approach. Simply adding ten percent does not make it more accurate. Furthermore, there is no basis for mechanically adding the ten percent maximum preferential advantage. The SDB premium only arises in the context of a particular solicitation, and after complicated assessment of competing offers. The premium would never be a specific fixed percentage.

*Defendant's Methodologies*

Defendant offered two approaches. Both are reflected in Dr. George Schink's expert report. Defendant first asserts that the contract price using the EPA clause based on the PMM index, although not specifically authorized, does in fact represent fair market value. Second, the government asserts that an independent calculation of fair market value using published open-market prices plus transportation premiums corroborates this position. Plaintiff challenges the government's approach because it utilizes an invalid EPA clause based on the PMM index, and is corroborated using erroneous transportation figures.

Although the court would be willing to utilize the PMM index if it in fact represented the best means of fixing fair market value, the court is persuaded that it is not adequate for present purposes. There was no evidence that the PMM index is used in setting prices for jet fuel. Furthermore, the prices in the index may or may not reflect transportation costs. Thus, it is possible that the movement of the PMM index for aviation fuels may not reflect a change in market price, but rather reflects a change in delivery terms in the contracts entered for that month. The court finds that the PMM is not an adequate price index for use in determining fair market value.

Dr. Schink's second theory, offered primarily as a means of corroborating the PMM index, begins with the published spot price for the Gulf Coast market and adds transportation costs, contract premiums, and cost of additives to arrive at fair market value at the end-use location. This approach closely tracks the approach that the airline industry uses to set contract prices with refiners for commercial jet fuel.

Although the court agrees with much of what Dr. Schink has done, the problem with his analysis is that it does not begin with the initial contract price. Rather, it uses an absolute price from the Platt's Oilgram Gulf Coast Spot (Low) index as a starting point for calculating fair market value. As explained above, it thus fails to take advantage of the best indicia of the special characteristics of the military jet-fuel market—consideration of socioeconomic preferences, the government's unique means of evaluating bids, the sheer volume of DFSC purchases, and the impact on sub-markets of transportation considerations.

Furthermore, there are some minor problems with his analysis, which may not affect the credibility of his approach but rather its accuracy. First, Dr. Schink's calculations

---

21. The more common method, according to Mr. Sturtz, is tying unit price to a reported spot-price average plus a set premium for the contract.

22. The only evidence of the use of the OPIS Contract index was the testimony of Roger Simons of Simons Petroleum, who testified that Simons Petroleum uses the OPIS Contract index to set base contract prices for jet fuel. Mr. Simons, however, testified further that he only dealt in small quantities delivered to small airports for use on private aircraft, and that he sold Jet–A only until about 1990.

use erroneous transportation costs between Houston and Tinker Air Force Base in Oklahoma. He failed to include the appropriate pipeline cost for taking fuel from Houston to Oklahoma. In addition, he incorrectly assumed that JP–5 fuel could be piped to Oklahoma; the DFSC's personnel testified that the fuel would have to be trucked because of the relatively small quantities involved. Second, Dr. Schink applied two different, though similar, approaches to the Vicksburg and Thomas refineries.[23] Third, Dr. Schink failed to account for a premium for JP–5 fuel, because of its relatively high production of naphtha as a byproduct, as compared to JP–8.

Once it is determined that the contract price is the point of departure, however, it becomes necessary to make adjustments to it through an EPA clause.[24] An EPA clause does not rely on absolute index prices, but rather changes in the index price over the reference price. Transportation and other premiums charged in addition to index prices in industry contracts, typically constant over the term of the contract, thus become irrelevant. The court agrees with Dr. Schink that the most accurate index for documenting changes in market prices is the Platt's Oilgram Gulf Coast Spot (Low) index. This index is widely used by the commercial jet-fuel industry and geographically best represents prices in the areas at issue.[25] Over the course of a year, the changes in the index should accurately reflect the changes occurring in commercial jet-fuel contracts. Combining the contract award price with an adjustment based on changes in the Platt's Oilgram Gulf Coast Spot (Low) index thus

would be an appropriate measure of fair market value.

The court, therefore, holds that fair market value should be determined using the contract award price adjusted monthly pursuant to a modified final EPA clause. The Platt's Oilgram Gulf Coast Spot (Low) index will be utilized instead of the PMM-based calculation. The reference price (base and monthly) should be determined in the same manner as determined under the contracts, i.e. weighted based on type of component.[26] Thus, for JP–4, the reference price should be weighted such that seventy percent is derived from a gasoline or naphtha index and thirty percent from a kerosene index. A reference price for JP–5 and JP–8 shall be calculated from spot prices for Jet–A. The record as developed does not permit the court to make these calculations itself. It follows that it cannot determine whether the amounts paid to Barrett are more or less than fair market value. For the same reason, the court will reserve decision on the plaintiff's improper termination claim and defendant's counterclaim until it is determined whether Barrett was underpaid.

## CONCLUSION

Fair market value should be determined using the contract award price and a modified EPA clause that utilizes the Platt's Oilgram Gulf Coast Spot (Low) index, as set out above. The parties are directed to cooperate in an effort to develop a single calculation of fair market value. Defendant is directed to file a status report reflecting those efforts and, if they are successful, the parties' joint calculations. If those efforts are unsuccessful, the status report will so note and furnish

23. He calculates the fair market value of deliveries from the Thomas refinery by using the transportation costs to the destination, e.g., Tinker Air Force Base, and subtracting the transportation costs between the Thomas refinery and the destination. He calculates a similar value for the Vicksburg refinery by using the transportation costs to the refinery, without factoring in the transportation costs to the base. This is ostensibly because there are an inordinate number of destinations for fuel from the Vicksburg refinery.

24. The irony of using an EPA clause is not lost on the court. Once the forbidden clause is eliminated from the contract, however, the court is

not constrained by the FAR in fixing fair market value.

25. The Gulf Coast market closely reflects the market in Oklahoma and Mississippi when transportation costs are considered. For the purposes of the court's determination of fair market value, the Platt's indices for the Gulf Coast will be used.

26. Because the changes in the index, according to Dr. Schink, should not be affected by transportation costs, using the Gulf Coast index without weighting other area indices, as in the original EPA clause, is appropriate.

each party's position. The report will be filed on or before November 6, 1998. Final judgment will be deferred.