**BARRETT REFINING
CORPORATION,
Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 96–15C, 96–724C, 96–725C,
96–726C, 97–321C.

United States Court of Federal Claims.

Oct. 29, 1999.

Sheryl L. Floyd, U.S. Department of Justice, Washington, D.C., with whom were Acting Assistant Attorney General David W. Ogden and Director David M. Cohen, U.S. Department of Justice, Washington, D.C., and Karen Schools, Defense Logistics Agency, Fort Belvoir, Virginia, of counsel, for defendant.

James D. Bachman, Washington, D.C., for plaintiff.

## OPINION

BRUGGINK, Judge.

Pending are cross-motions in which the plaintiff moves to dismiss each of the defendant's amended counterclaims, and the defendant seeks summary judgment on its amended counterclaims. Based on its initial complaint and this court's decision in *Barrett Refining Corp. v. United States*[1], 42 Fed.Cl. 128 (1998), plaintiff Barrett Refining Corporation ("Barrett") seeks $1,546,429 in damages alleged to have resulted from the government's use of an unauthorized Economic Price Adjustment ("EPA") Clause in contract DLA600–91–D–0512. The government counterclaims, seeking recovery or offset of alleged overpayments to Barrett under contracts DLA 600–91–D–0512, 92–D–0505, 93–D–0577, and 94–D–0492. The court's earlier decision in *Barrett* provided a methodology for calculating the fair market value of jet fuel delivered to the government under the above contracts. *See* 42 Fed.Cl. at 138. The primary issue raised here is whether the court's use of a substitute EPA clause to measure Barrett's recovery triggers an independent right in favor of the government to recover portions of its earlier contract payments to Barrett when those payments exceed fair market value as measured by the substitute EPA clause.

The matter has been fully briefed and orally argued. For the reasons set out below, we find that the government's actual payments to Barrett do not constitute recoverable overpayments, and that therefore the government has no legal basis for seeking damages from Barrett or for offsetting any money due Barrett under contract 0512.

## BACKGROUND

This case arises from jet fuel contracts between the Defense Fuel Supply Center, now Defense Energy Support Center (DFSC), and Barrett. Each of these jet fuel contracts was fixed price and contained an economic price adjustment (EPA) clause, one of several versions of B19.33, Economic Price Adjustment—Published Market Price. The EPA clause was based on the monthly average sales price or market price of refined petroleum products as reported by the Department of Energy, Energy Information Administration, in its publication, the Petroleum Marketing Monthly (PMM). In *MAPCO Alaska Petroleum, Inc. v. United States*, 27 Fed.Cl. 405 (1992), this court ruled that Federal Acquisition Regulation (FAR) § 16.203 did not permit the use of escalators such as the PMM, which are market-based indices of finished prices.

Barrett then sued here, asserting that it suffered damages resulting from the government's use of an improper EPA clause in four of its jet fuel contracts. The government conceded that the clause at issue was unenforceable, and in July 1998 trial was held to determine how the fair market value of the jet fuel delivered under the contract ought to be calculated for purposes of compensating Barrett. The court determined that fair market value should be calculated using the contract award price adjusted monthly pursuant to the Platt's Oilgram Gulf Coast Spot (Low) price index instead of the PMM. *See Barrett*, 42 Fed.Cl. at 138. It left the parties to attempt to agree on the impact of the ruling in terms of damages.

The parties were unable to agree on two aspects of the damage calculation. First,

---

[1]. The Court's earlier decision in *Barrett* sets out more fully all of the facts relating to this case. *See Barrett*, 42 Fed.Cl. at 128–134.

the outcome turned on which type of index to use in calculating the reference price for JP–4 (a type of jet fuel delivered under the contracts). The court earlier held that when using the modified Platt's EPA clause to calculate fair market value, the reference price of JP–4 should be weighted such that seventy percent would be derived from either a gasoline or naphtha-based index and thirty percent from a kerosene index. Defendant urged use of a gasoline-based index for calculating 70% of the fuel's value; plaintiff urged use of a naphtha-based index for making the same calculation. Second, the parties disagreed on whether the necessary implication of the court's ruling was that defendant had overpaid plaintiff on every contract in which the plaintiff could not prove entitlement to a recovery.

Barrett currently seeks recovery of $1,546,429 in alleged underpayments resulting only from the use of the invalid EPA clause in contract 0512. It concedes, in short, that under the prior ruling, it was not underpaid on the three remaining contracts.

After trial on Barrett's claim, the government sought and was given permission to file additional counterclaims.[2] In these counterclaims, the government argues that application of the Platt's EPA clause to the other three contracts shows that when all the contracts are considered together, Barrett actually received net overpayments totaling $1,347,922 in excess of the fair market value of the fuel delivered to the government. The government asserts the right, at a minimum, to apply these alleged overpayments as a set-off against any recovery due Barrett, and optimally, to collect the difference between fair market value under the Platt's EPA clause and the money actually paid to Barrett under the contracts.

## THE PARTIES' THEORIES

### A. Barrett's Claim

Barrett argues that the court should use the Platt's EPA clause created in the Octo-

ber 1998 decision as a lens through which to view the fair market value of the jet fuel delivered under the contracts, and that for any contract where the government's actual payments to Barrett are less than fair market value as measured by the Platt's EPA clause, Barrett should recover. Barrett proposes that the proper reference price for JP–4 should be determined using a naphtha-based index for seventy percent of the fuel's price, and a kerosene index for the remaining thirty percent. If this index is used in conjunction with the Platt's EPA clause, both parties agree that Barrett received $1,546,429 less than fair market value for the fuel delivered pursuant to contract 0512, and that Barrett received greater than fair market value for the fuel delivered under the other three contracts. Based on these calculations, Barrett argues it should be awarded $1,546,429 in damages, plus statutory interest.

### B. The Government's Counterclaims

The government challenges Barrett's claim on several grounds. First, the government argues that the reference price for JP–4 under the Platt's EPA clause should be calculated using a gasoline-based index, as opposed to the naphtha-based index proposed by Barrett. It contends that because the JP–4 formula in the contracts called for a thirty percent kerosene/seventy percent gasoline ratio, the use of a gasoline-based index is consistent with efforts to preserve as much of the parties' original agreement as possible. If the government's gasoline-based index is used in conjunction with the Platt's EPA clause as the mechanism for analyzing fair market value, then both parties agree that the actual payments received by Barrett under all the relevant contracts exceed the fair market value of the fuel delivered. In that case, Barrett would recover nothing.

Even if a naphtha-based index is chosen to measure the fuel price, however, the

---

**2.** In connection with Barrett's original claim under contract 0492, the government filed a counterclaim, asserting that the DFSC had failed to recoup interim overpayments under contract 0492 in the amount of $966,388.80 or to collect $11,916.50 in demurrage and administrative

fees. Barrett has not objected to this particular counterclaim, and concedes that it owes $978,-305.30 under contract 0492. The government has already accomplished an offset to satisfy this amount by withholding payments on other contracts.

government argues that Barrett still should not recover. The government's initial contention is that, after the initial EPA clause using the PMM index is struck out, the only basis for Barrett's recovery is *quantum meruit*, which limits recovery to the value of the benefit conferred on the government minus any amounts already paid to the contractor. According to the government, when the appropriate calculations for all four contracts are lumped together, and when fair market value is calculated using the Platt's EPA clause, the calculations reveal that Barrett has already received payments greater than the value of the benefit conferred on the government, meaning that Barrett suffered no damages from the government's improper insertion of the original EPA clause. At a minimum, according to the government, the overpayments on contracts 0505, 0577, and 0492 should be offset against the underpayments on contract 0512, and thus Barrett should recover nothing.

Alternatively, however, the government takes that argument one step further to formulate an affirmative claim for money damages. The government contends that the calculations under all four contracts should be considered together in fixing the appropriate recovery, and that any payments made by the government that exceed fair market value after adjustments under the Platt's EPA clause are erroneous overpayments that it has the right, and indeed the duty, to recover.

The government presents several theories as grounds for recovery on its counterclaims. Common to each is the premise that any excess in the amounts actually paid to Barrett as compared to the Platt's EPA fair market value constitutes an illegal "overpayment". The government argues that it has an inherent legal right to recover funds which its agents, through either mistake of fact or mistake of law, have wrongfully, erroneously, or illegally paid out. It also contends that where an invalid price term is struck from a contract, the parties proceed under an implied-in-fact contract which substitutes the court-ordered price mechanism for the price term deemed to be invalid. The resulting implied-in-fact contract is an actual contract and the price determined in accordance with the court's substitute pricing mechanism becomes the actual contract price. On this basis, the government argues that Barrett was overpaid under the implied-in-fact pricing term on the three remaining contracts and that it has a legal right to recover these overpayments.

### C. Barrett's Response

In response, Barrett argues that the payments under the four fuel contracts were not illegal or erroneous "overpayments" in the sense that the government uses the term. Barrett points out that although the specific method of adjusting the fuel price under the original EPA clause was improper, there is nothing inherently illegal or erroneous about the amount of money the government actually paid out in return for the amount of fuel Barrett actually delivered. Barrett goes on to argue that the government should not be able to benefit from its improper calculation method under the original EPA clause; nor should it be permitted to capitalize on plaintiff's challenge, particularly where the government received the full benefit of its original bargain.

### DISCUSSION

### A. The choice of an index for measuring the reference price of JP–4:

■ The threshold issue is whether to use a naphtha-based or a gasoline-based index for measuring the reference price of JP–4 under the Platt's EPA clause. The contracts under which Barrett delivered JP–4 utilized gasoline-based indices in determining reference prices under the escalator clauses. The government argues that using a gasoline-based index for calculating reference prices under the Platt's EPA clause is therefore appropriate, because it is the choice most consistent with the parties' original agreement.

Barrett responds that the court should choose the index that offers the closest approximation of fair market value in relation to the product that Barrett was actually selling. Barrett contends that the only reason a naphtha-based index was not used in the original PMM EPA clause is

because a naphtha index was not available for the cities referenced in the PMM. In contrast, using the Platt's Gulf Coast Spot (Low) index, the government's experts testified that a naphtha index, based on reported spot prices in Houston, is readily available. Barrett argues that this index offers the most accurate data for calculating the fair market value of JP–4 under the Platt's EPA clause.

The court finds that using a naphtha-based index for determining the reference price of JP–4 under the Platt's EPA clause is the appropriate approach. The entire function of the Platt's EPA clause is to serve the limited purpose of testing whether or not Barrett received fair market value for the actual fuel it delivered. Although the original PMM EPA clause referenced a gasoline-based index, the JP–4 provided by Barrett was composed of seventy percent naphtha. A naphtha-based index, therefore, provides data that more closely reflects the product Barrett was actually selling. It makes little sense in these circumstances to disregard the availability of a more accurate naphtha-based index.

Furthermore, if the Platt's EPA clause had been used from the beginning, then the parties likely would have utilized Platt's reported Houston spot prices for naphtha to create a naphtha-based index for purposes of adjusting the price of JP–4. Adopting the government's proposed approach of combining the Platt's EPA clause with a gasoline-based index for JP–4 would be the least likely scenario intended by the parties at the time of the original agreements.

B. *The Competing Claims:*

(1). *Barrett's Claim*

■ Using the naphtha-based reference price in conjunction with the Platt's EPA clause selected by the court in its October 1998 decision, calculations from both parties show that Barrett did not receive fair-market value for the fuel delivered to the government pursuant to contract 0512. It was paid at least fair market value on the other three contracts. As to contract 0512, the difference between what Barrett actually received and fair market value as calculated under the

Platt's EPA clause is $1,546,429. Because the government may not benefit from use of an unauthorized EPA clause, it has a duty to pay Barrett the difference between what was actually paid and the appropriate adjusted price under contract 0512. *See Beta Systems Inc. v. United States,* 838 F.2d 1179, 1185 (Fed.Cir.1988); *see also Craft Mach. Works, Inc.,* 90–3 B.C.A. (CCH) P 23,095 at 115,969, 1990 WL 133158 (A.S.B.C.A. June 29, 1990). It does not follow, however, that the government in turn possesses an independent legal right to assert counterclaims under the other three contracts simply because the plaintiff was not underpaid.

(2). *The Government's Counterclaims*

In support of its counterclaims, the government argues that this court's decision to substitute an implied-in-fact price term incorporating the Platt's EPA clause in place of the original PMM EPA clause requires the court to evaluate all the dealings between the parties as if the Platt's EPA clause had been part of the contracts from the beginning, and to adjust the prices paid to Barrett accordingly.

This argument, set out in Count II of the government's counterclaims, misapprehends the function of the Platt's EPA clause chosen by the court to measure fair market value in place of the improper PMM EPA clause. First, the substitution of the Platt's index for the EPA index in the price clause for purposes of determining fair market value does not render the entire contract an implied-in-fact contract. *See Urban Data Systems, Inc. v. United States,* 699 F.2d 1147, 1154 (Fed. Cir.1983); *Gold Line Refining, Ltd. v. United States,* 43 Fed.Cl. 291, 294–95 (1999). Instead, the parties clearly have an express contract, bargained for and agreed to by both sides. Once the unauthorized clause is struck out, however, this express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value for the fuel delivered by Barrett under the contract. *See United States v. Amdahl,* 786 F.2d 387, 395 (Fed.Cir.1986). The Platt's EPA clause merely functions as a mechanism for testing whether the govern-

ment has actually kept this implied-in-fact promise.

The original price term represented a promise by the government to pay Barrett for jet fuel delivered under the contract. In return, Barrett promised timely deliveries of the appropriate quantities of fuel, a promise Barrett has fully performed. When the PMM EPA clause was struck out as invalid, Barrett was forced to rely on the *government's* implied-in-fact promise to pay for what it accepted in order to justify Barrett's claim for fair market value compensation. *Barrett's* promises embodied in the express contract, however, did not change. Barrett fulfilled all of its obligations by delivering the appropriate quantities of fuel to the government. There is no reason to assume, as the government does, that the government's implied-in-fact promise brings with it an implied promise by Barrett to return to the government money that Barrett has already received for fuel that Barrett has already delivered.

In order to grant the government's counterclaims, the court would have to view all transactions between Barrett and the government as though the Platt's EPA clause was present in each contract from the beginning, and then determine how much money the government would have owed Barrett for the amount of fuel actually delivered by Barrett under these hypothetical contracts. Essentially, the government invites the court to undertake a sort of time travel and to determine all the rights of both parties under a different set of assumptions than those on which the parties based their actual conduct.[3]

The court is reluctant to accept this invitation, in part because such an exercise is inherently speculative and arbitrary, but also because it shifts to the innocent party the risk that the government utilized an unenforceable contract clause. Barrett had no control over use of the PMM EPA clause, and indeed attempted, unsuccessfully, to persuade the agency not to use it. The government's insertion of the Platt's index in the

EPA clause of the original solicitation would have created a different set of risks for prospective bidders, in turn triggering different bids than those actually submitted by the offerors, including Barrett. Indeed, the primary purpose of any EPA clause is to force contractors to offer lower bids by eliminating the need to include contingencies to cover unexpected cost increases. *See MAPCO Alaska Petroleum, Inc.,* 27 Fed.Cl. at 413; *Craft Mach. Works, Inc.,* 90–3 B.C.A. (CCH) P 23,095 at 115,968, n. 3, 1990 WL 133158; *see also* Federal Acquisition Regulation (FAR) § 16.203–2. Although Barrett could not control the government's initial decision to use the PMM escalator in the EPA clause, Barrett at least had notice of the clause and could take it into account in deciding whether and how much to bid.

The reformation of a price term in these circumstances is thus for a limited purpose. The entire contract is not revisited. The court's sole inquiry is whether Barrett received at least fair market value. Failure to engage in this inquiry would allow the government to benefit from an unauthorized EPA clause in violation of the FAR, which is impermissible. *See Beta Systems, Inc.,* 838 F.2d at 1185 ("The government's insistence [on using an improper EPA clause], and the contractor's acquiescence, does not immunize the government from the consequences of [the] failure of the EPA clause to comply with the law as stated in the DAR.... If the [improper] index violated the DAR, the government cannot, by law, benefit from it."). Where Barrett did receive payment at least equal to fair market value under the Platt's EPA clause, the government's obligations have been met, and Barrett has no right to further recovery.

Where the government received the full benefit of its initial bargain, however, there is no justification for further inquiry into whether, in the aggregate, use of the proper EPA clause from the beginning could have allowed the government to obtain a lower

---

**3.** *See* Def.'s Opposition to Pl.'s Motion to Dismiss and Def.'s Motion for Summary Judgment at 18–19 (urging the court to "put the parties back into the same position that they would have been in if the government had employed an authorized

clause by (1) utilizing the government's overpayments to offset any underpayments the government might have made, and (2) requiring Barrett to compensate the government for its overpayments.").

price than what it actually paid in return for the contractor's full performance of its contractual obligations. To hold otherwise would transform the government's implied-in-fact promise to pay fair market value into an affirmative cause of action.

Defendant attempts to avoid this result by basing Count I of its counterclaims on the government's legal right to recover money illegally or erroneously paid to a contractor. It cites numerous cases supporting the proposition that it cannot be bound by the factual or legal mistakes of its agents in disbursing money without proper authority. *See, e.g., Wisconsin Central R. Co. v. United States,* 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399 (1896); *United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938); *Fansteel Metallurgical Corp. v. United States,* 145 Ct.Cl. 496, 499–500, 172 F.Supp. 268, 270 (1959). The common rationale supporting this theory is that there are inherent limits on governmental authority, including limitations on the type and amounts of payments that government agents can make to third parties in return for particular goods or services. *See Wisconsin Central,* 164 U.S. at 210, 17 S.Ct. 45. The government contends that these limits in turn imply a right and even a duty on the part of the government to recover payments made by government agents outside the scope of their proper authority. *See Fansteel,* 145 Ct.Cl. at 500, 172 F.Supp. at 270; *Wright Runstad Properties Ltd. Partnership v. United States,* 40 Fed.Cl. 820, 827 (1998).

None of the cases cited by the government deal with the same species of error present here. The government's cases are more analogous to those situations where the flaws in the transaction between the parties are so egregious as to render the entire contract *void ab initio.* Such a result is usually limited only to those cases where (1) there is a clear lack of contracting authority in the relevant individual or agency; (2) there is an absence of a link between the actual payment made and a corresponding appropriation; or (3) the award or performance of the contract would be plainly illegal. *See Cubic Applications Inc. v. United States,* 37 Fed.Cl. 345, 355–56 (1997).

The government, for example, relies heavily on *Wurts,* 303 U.S. at 415, 58 S.Ct. 637, but in *Wurts,* the improper overpayment took the form of a tax refund which the defendant conceded he had no right to receive, and which was clearly in excess of the amount authorized by statute for someone in the defendant's particular circumstances. In *United States v. Burchard,* 125 U.S. 176, 8 S.Ct. 832, 31 L.Ed. 662 (1888), the improper overpayments involved naval retirement benefits that were paid out in excess of the statutory maximum for a party who had served the particular length of time served by the sailor in question. In *Wisconsin Central,* 164 U.S. at 212, 17 S.Ct. 45 the overpayment consisted of money paid to a railroad company well in excess of the statutory maximum rate Congress had authorized the Executive branch to pay for transporting the mails. In *Kingman Water Company v. United States,* 253 F.2d 588, 590 (9th Cir. 1958), a public utility charged the government for services rendered at a higher rate than the maximum rate the utility was permitted to charge under state law. The common feature in these cases is that some statute or regulation, independent of the contract, expressly prohibited the particular payments made by the government in relation to the particular goods or services supplied by the contractor.

In *Wright Runstad Properties,* 40 Fed.Cl. at 820, the overpayment was illegal and thus recoverable because the payment (intended to compensate a landlord for taxes on property leased by the government) dealt with a type of tax assessment the government was not authorized to pay for under the contract, and thus was undertaken without authority. In *J.W. Bateson Company, Inc. v. United States,* 308 F.2d 510, 514 (5th Cir.1962), the overpayment consisted of paying the contractor profits twice for a single set of materials. In *Fansteel,* 145 Ct.Cl. at 500, 172 F.Supp. at 270, the contractor had clearly breached its obligations under the contract, and the contracting officer ("CO") proceeded to gratuitously pay the contractor in full, even though the government had not received the appropriate amount of goods or services in return. *Wright Runstad, Bateson,* and *Fansteel* are

all cases in which the court looked to the original contract and found that the government had mistakenly paid out money based upon an improper interpretation of the contract itself.

In the final two cases cited by the government in support of its supposed "inherent right" to recover from Barrett, the entire object of the contract was illegal. In *Swift & Company v. United States*, 257 F.2d 787, 794–95 (4th Cir.1958), the government provided payments to dairy farmers without receiving in return either possession of the dairy products or a promise to repay the government. This type of contract amounted to a subsidy for certain dairy farmers, and was expressly prohibited by statute. Similarly, in *Consortium Venture Corp. v. United States*, 5 Cl.Ct. 47, 51–52 (1984), payments were made to a contractor in return for job-training services, despite the fact that a statute forbade the agency from using its appropriations to contract for job-training services.

■ In contrast to the cases relied on by the government, the Federal Circuit has explicitly held that the inclusion of an unauthorized EPA clause *is not* so fundamental a flaw as to render a contract *void ab initio.* See *Urban Data Systems, Inc.*, 699 F.2d at 1154; *see also Gold Line Refining, Ltd.*, 43 Fed.Cl. at 294–95. Only the specific method of adjustment used in the original EPA clause was unauthorized. At the time of contract formation, there was no independent statute or regulation barring the CO from contracting to pay Barrett the amount the government has actually paid in return for the amount of jet fuel Barrett has actually delivered. The object of the contract was not illegal, and the contract cannot be considered void as contrary to public policy. Nor is this a case where the government gratuitously paid money in excess of the amount demanded by the parties' original express contract. There is no allegation that the CO lacked general authority to contract, and the procuring agency in fact had full authority to award a contract for the services at issue.

Furthermore, the government has not alleged that Barrett breached the contracts, and in fact Barrett fully performed all that was expected of it under the parties' express agreement.

The government takes pains to assert that its counterclaims are based on a legal right, as opposed to an attempt merely to invoke the equitable remedy of *quantum meruit* (which would call for some underlying right to recovery [4]). The government's only basis for characterizing the contract payments here as "erroneous overpayments", however, is a comparison between the actual payments and the payment figures arrived at under the court-created Platt's EPA clause. The government's supposed "independent right" to recover in this case is thus dependent both on Barrett's having sought *quantum meruit* relief and on the court having devised a substitute EPA clause to help measure the appropriate boundaries of that relief.

■ The government cites no cases, and the court has found none, in which *quantum meruit* has been used affirmatively by the government in a similar situation to recover monies from a contractor. Indeed, it would be surprising if such cases existed. See *Missouri Utilities Co. v. City of California, Mo.*, 8 F.Supp. 454, 468 (W.D.Mo.1934)("He who seeks equity must do equity. And the action for money had and received is governed by equitable principles. Neither then could the United States recover from [a contractor] in an action for money had and received, not in the form of a mere gratuity, but upon conditions met and performed"). No equity lies with the government here. It drafted the contract and inserted the defective price term without participation from Barrett, which was one of many bidders on a standardized form solicitation. In short, *quantum meruit* only operates in one direction—in favor of the entity furnishing goods or services to the government under an implied contract to receive fair market value. To the extent it develops that the

. See Def.'s Reply to Pl.'s Opposition to Def.'s Motion for Summary Judgment at 5–6, n. 5 ("The Government is entitled to recover these overpayments [to Barrett] under the legal theory articulated in *United States v. Wurts*, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938), and its progeny, not an equitable theory.").

entity cannot prove it was underpaid, it loses *its* claim, as does Barrett here on three of the four contracts. It does not, merely by asking the question of whether it was underpaid, put itself at risk of an affirmative claim by the government. The court holds that where the government is on notice that its chosen price clause may be unauthorized, the government alone bears the risk that the unauthorized clause may, in certain cases, result in higher payments than would be demanded under an alternative, permissible clause.

■ As an alternative to affirmative recovery from Barrett, the government, in Count III, argues in favor of a set-off in the amount of the money paid to Barrett in excess of fair market value, as measured by the Platt's EPA clause.

Count III relies on the same flawed assumptions concerning the function of the Platt's EPA clause that are discussed above. Even an offset would require an independent, affirmative right in the government to money. Such a right does not exist. The limited scope and unilateral nature of the government's implied-in-fact promise to pay at least fair market value under each contract prevents such a promise from being used to take from Barrett money it has already received in return for performing its contractual obligations. The Platt's EPA clause, in other words, sets a floor for recovery under each contract, but it does not set a ceiling. In this way, as much of the parties' original expectations are preserved as possible, while ensuring that the government does not benefit from its decision to insert an unauthorized EPA clause into its jet fuel contracts.

## CONCLUSION

Because the court finds the underlying bases for the government's counterclaims to be without merit, the court does not reach the issues raised by both parties with respect to Barrett's assignment rights under the contracts. The Clerk is directed to enter judgment for plaintiff in the amount of $1,546,429.00, plus interest pursuant to 41 U.S.C. § 611 from May 5, 1997. The government's original counterclaim in 96–15C for an offset in the amount of $978,305.00 under contract 0492 is granted, although that offset has already been accomplished by withholding payments on other contracts. The government is therefore not entitled to judgment for that amount. The government's remaining counterclaims are dismissed with prejudice for failure to state a claim. Each party to bear its own costs.